The CITY OF SHOREACRES, et al., Plaintiffs,

v.

Colonel Leonard D. WATERWORTH, District Engineer, Galveston District—U.S. Army Corps of Engineers, et al., Defendants,

The Port of Houston Authority, Intervenor.

No. CIV.A. H–03–2443.

United States District Court, S.D. Texas, Houston Division.

May 5, 2004.

James B. Blackburn, Jr., Blackburn & Carter, Michael John Maloney, Maloney, Martin & Mitchell, Michael B. Martin, Maloney Martin et al., Thomas O. Deen, McFatridge Baker et al., James T. Liston, Attorney at Law, Houston, TX, Richard R. Morrison, III, Attorney at Law, Kemah, TX, for Plaintiffs.

Eileen T. McDonough, Washington, DC, for Defendants.

Sharon Marie Mattox, Vinson & Elkins, Houston, TX, for Intervenor–Defendant.

### ORDER

GILMORE, District Judge.

Pending before the Court are Plaintiffs' Motion for Summary Judgment (**Instrument No. 92**), Defendants' Motion for Summary Judgment (**Instrument No. 96**) and the Intervenor Port of Houston Authority's Cross Motion for Summary Judgment. (**Instrument Nos. 94**). Based on the arguments of the parties and the responses hereto, Plaintiffs' Consolidated Response on Summary Judgement (Instrument No. 100), Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Instrument No. 99) and the Intervenor Port of Houston Authority's Reply to Plaintiffs' Cross–Motion for Summary Judgment (Instrument No. 102) and the oral arguments presented in the hearing before the Court on April 20, 2004, the Court finds that Defendants' summary judgment motions (**Instrument Nos. 94 and 96**) should be **GRANTED** and the Plaintiffs' motion (**Instrument No. 92**) should be **DENIED**.

### I. Factual Background

This action arises from the proposed construction of the Bayport Project a marine terminal consisting of seven container berths and three cruise berths scheduled to be built in phases over the course of the next 20 years on the existing Bayport Ship Channel on Galveston Bay. (AR 3297 at 9–10).[1] Plaintiffs contend that Defendant United States Army Corps of Engineers (the "Corps") violated the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA" or "Section 404") in issuing Defendant–Intervenor the Port of Houston Authority (the "Port") a permit to build the Bayport Project.

The Bayport site is located south of Shoreacres and north of Seabrook, Texas, and is situated along the Bayport Ship Channel, a man-made industrial channel

---

1. The Administrative Record ("AR"), which is designated by the agency, consists of "the full administrative record that was before the [administrative officer] ... at the time he made his decision." *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 624 (5th Cir.1993). In evaluating the sufficiency of an Environmental Impact Statement ("EIS"), the focus of the court should be on the administrative record upon which the administrator's determination was made. *See Louisiana Environmental Society, Inc. v. Dole*, 707 F.2d 116, 119 (5th Cir.1983).

servicing several chemical manufacturing facilities. (AR 2385.10 at 1-3—1-4).

On October 8, 1998, the Port applied to the Corps to build the Bayport Project. (AR 3297 at 1). In November 1999, Harris County voters approved $387 million in bonds for the construction of the Bayport Project. (AR 3297 at 2, 34).

NEPA requires Federal agencies to consider the environment during their decision-making processes. It also requires agencies to provide interested parties with an opportunity to participate in the environmental evaluation process. (AR 3297 at 1). In addition, Section 404 of the CWA authorizes the Corps to issue permits, after notice and opportunity for public hearing regarding the discharge of dredged or fill material into waters of the United States, which include jurisdictional wetlands. (Id.).

As required under NEPA, the Corps held an agency scoping meeting and public information workshop in August 1999, at the Pasadena Convention Center to determine the scope of the analysis and the potentially significant effects of the Bayport Project that would be analyzed in the Environmental Impact Statement ("EIS").[2] (AR 3297 at 2, 66–69; AR 308). Based on the issues identified in that initial meeting, the Port made modifications to the proposed project. The Corps considered the Port's modified proposed project and published a Draft EIS ("DEIS") in November 2001. (AR 3297 at 2, 70). Subsequently, three public workshops organized by the Corps were held during November and December 2001 to provide information to the public regarding the Bayport Project and the DEIS. Two workshops were held in Pasadena and one was held in Houston. (Id.). Public comments on the DEIS were accepted by the Corps through March 13, 2002. Public Notices seeking comments were published by the Corps on April 4, 2002 and on July 22, 2002. The Corps provided a 30-day comment period with each notice. (AR 1929; 3297 at 2).

After performing an additional analysis of the environmental concerns identified by the public comments, the Corps published the Final EIS ("FEIS") on May 16, 2003. (AR 3297 at 2, 70). The Corps accepted public comments on the FEIS through August 16, 2003. (AR 3297 at 2; 2421). The Corps issued another Public Notice on August 12, 2003, which allowed public comments until September 12, 2003 on additional mitigation areas that the Port added to the proposed project to compensate for the planned destruction of wetlands. (AR 3297 at 2).

On June 26, 2003, Plaintiffs, City of Shoreacres, City of Taylor Lake Village Texas, Galveston Bay Conservation and Preservation Association, Galveston–Houston Association for Smog Prevention, Texas Committee on Natural Resources, Galveston Bay Foundation, Houston Audubon Society, Houston Yacht Club, Professionals Involved in Seafood Concerned Enterprises, Gulf Restoration Network ("Plaintiffs" or "Shoreacres"), filed this action against Defendants, Colonel Leonard D. Waterworth, Lieutenant General Robert B. Flowers, Acting Secretary Les Brownlee and the

---

**2.** Under NEPA, agencies must prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Preparation of an EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

U.S. Army Corps of the Engineers ("Defendants" or "Corps"), claiming that the Corps' prospective issuance of the permit for the Bayport Project did not comply with requirements of (1) the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"); (2) the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), and (3) the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* ("CWA"). Specifically, Plaintiffs contend that Defendants violated these statutes by failing to conduct the requisite environmental impact and alternative analyses that NEPA and CWA require before issuing the Bayport Project permit. Additionally, Plaintiffs argue that the Corps should deny the Port's permit application because Bayport is not the least environmentally damaging practicable alternative under the CWA.

On December 19, 2003, the Corps issued the Record of Decision, which concluded that the Bayport Project "is not contrary to the public interest and that a Department of the Army permit, with conditions, should be issued." (AR 3297 at 126). The Corps issued a permit to the Port of Houston for construction of the Bayport Project on January 5, 2004.

On January 20, 2003, Plaintiffs filed a Motion for Preliminary Injunction. (Instrument No. 59). Plaintiffs requested that the Court grant a preliminary injunction, preventing any construction of the Bayport Project by the Port and suspending the operation of the Corps permit until the Court could render a decision on the merits of this case. (Id., at 36). Plaintiffs sought the injunction because they believed the Port intended to "bulldoze, and destroy, the many acres of unique wetlands" before a decision could be made on the merits. (Id., at 4). Plaintiffs asserted that the development at Bayport would impose escalating environmental harms including air pollution and noise in the nearby city communities. According to Plaintiffs, the full extent of environmental harms could not be determined due to the violation of NEPA and Section 404 of the Clean Water Act. Plaintiffs claimed that precedent established that the environmental harms and lack of adequate information constituted irreparable harm. (Id.).

On February 10, 2004, Defendants filed their Response to Plaintiffs' Motion for Preliminary Injunction. (Instrument No. 65). Defendants argued that they had invested significant resources into the permit process and that there had been substantial opportunity for public participation throughout the permit process. In addition, the Corps had provided a detailed and comprehensive explanation of its decision and of the information upon which it was based. Defendants also contended that Plaintiffs had failed to show the necessary likelihood that they would prevail on the merits. In such circumstances, Defendants argued that the public interest would not be served by suspending a validly-issued Corps permit and disrupting the legitimate expectations of the applicant to whom the permit was issued, as well as the expectation of the public, who expected to benefit from the completion of this project. (Id., at 38).

A Preliminary Injunction hearing was held on February 27, 2004, where all parties were present and were heard on the issues. After the presentation of evidence, the Port agreed to "stand still" and take no further action in regard to the Bayport Project and the Court offered to expedite the case schedule and ruling. Therefore, pursuant to the Court's Order entered February 27, 2004, the parties filed cross-motions for summary judgment on April 9, 2004 and responses on April 16, 2004.

Plaintiff Shoreacres filed its Motion for Summary Judgment (Instrument No. 92) arguing that the Corps violated specific

provisions in NEPA and the CWA. Specifically, Plaintiffs contend that the Corps made six individual violations in the permitting process. Plaintiffs argue that the Corps was arbitrary and capricious by refusing to analyze the potential dredging of a fifty foot ship channel, failing to address "community cohesion", undercounting the acres of the jurisdictional wetlands, as well as failing to approve the least damaging practicable alternatives, i.e. Shoal Point and Pelican Island. Plaintiffs also contend that the Corps violated its duty under NEPA by failing to analyze the Bayport and Shoal Point projects together as a cumulative action—in the same EIS. Additionally, Shoreacres believes that it was arbitrary and capricious for the Corps to permit Bayport for seven berths in addition to Shoal point for six berths, after previously-and for good reasons-rejecting three container berths at Shoal Point and four container berths at Bayport as environmentally unacceptable. (Instrument No. 92, at 1–2).

### 1. *Refusal to Analyze the 50–foot Ship Channel*

Plaintiffs assert that in the Bayport EIS, the Corps admits that further dredging beyond 45 feet would "likely be necessary." (AR 2385, at 4–19). Accordingly, the Plaintiffs assert that the Corps, properly determined that it needed to evaluate the cumulative impact of deepening of the Houston Ship Channel to fifty feet. (Instrument No. 92, at 15). However, Plaintiffs argue that during NEPA process, the Corps changed its mind and refused to do this critical analysis. Therefore, Plaintiffs complain that the Bayport DEIS and FEIS both state that the issue of the impact of the fifty foot channel, which was raised in the scoping process, would be addressed in the Bayport DEIS and FEIS, and yet neither contains any such analysis. (Id., at 16). Shoreacres also argues that under the CWA, the Corps must consider foreseeable cumulative impacts when it is making required factual assessments to determine whether significant degradation to the nation's waters will occur. Plaintiffs contend that they provided proof that the further deepening of the Houston Channel will cause or contribute to a significant degradation of Galveston Bay by increasing salinity. (Id., at 17–18). According to Plaintiffs, if significant degradation is found, 40 C.F.R. § 230.10(c) requires that the permit be denied.

### 2. *Failure to Address Community Cohesion*

Plaintiffs also claim that the Corps failed to consider the impact of Bayport on the local land use patterns and "community cohesion." Plaintiffs assert that residential neighborhoods surround Bayport and that according to the FEIS, approximately 23,702 people live within the Bayport study area. (AR 2385.10, at 3.4–4). Plaintiffs argue that the Corps never presents an analysis of what its own findings mean with regard to the land use patterns and "community cohesion" within Plaintiff cities. Plaintiffs claim that "NEPA requires analysis of Bayport's impacts on community cohesion", however, they provide the Court with no statutory or caselaw support for that assertion. (Instrument No. 92, at 19). Shoreacres also contends that the Corps "itself specified community cohesion among the '[i]tems for investigation and inclusion in the social profile ...'" (Id., citing AR 425, at 2) (Carol Hollaway's Example of the Scope of Work for Social Impact Analysis). Plaintiffs also note that in the Corps' Notice of Intent to Prepare a DEIS, the Corps included "community cohesion" in a long list of significant issues the DEIS was "likely to include" (AR 288, at 2), however according to Plaintiffs this analysis was not performed. (Instrument No. 92, at 20).

Plaintiffs assert that the impacts that the Corps identifies in the FEIS, including noise, vibration, traffic congestion, fine particles in the air, and Bayport's incompatibility with Seabrook's zoning ordinance, will destroy the communities' cohesion. However, Plaintiffs assert that the Corps failed to do the analysis that would demonstrate this result. Plaintiffs state that:

> Nothing in the Administrative Record explains why the issue of community cohesion and land use impacts was not thoroughly analyzed and disclosed. Nothing explains why Bayport's impact on residential property values was not analyzed and disclosed. Nothing explains why Bayport's impact on institutional uses such as schools and cities that rely on residential taxes for the[ir] viability was not disclosed.... the mistreatment of community cohesion and land use in this FEIS violates NEPA and was arbitrary and capricious.

(Instrument No. 19, at 21).

### 3. *Undercounting of the Jurisdictional Wetlands*

Plaintiffs contend that the Corps unlawfully and significantly undercounted the number of acres of jurisdictional wetlands, by refusing to consider information essential to determine adjacency. Plaintiffs argue that the Corps violated Section 404 of the CWA by steadfastly refusing to consider ditch connections, overland sheet flow and accurate floodplain mapping data in determining the extent of jurisdictional wetlands at Bayport. Plaintiffs argue that an extensive system of ditches on the Bayport site connects many acres of wetlands to traditional navigable waters. According to Plaintiffs, the Corps failure to include man-made ditches runs counter to existing case law, where ditches were construed as tributaries, thereby providing the connection to the wetlands in question and rendering them jurisdictional. (Instrument No. 92, at 23–24).

In addition, Plaintiffs state that they "know of no case that precludes the use of overland sheet flow to establish jurisdiction, and that in this case the overland sheet flow drains directly into Galveston Bay, a navigable water." (Instrument No. 92, at 26). "By refusing to consider overland sheet flow and drainage ditches to establish jurisdiction", the Corps "disregarded specific agency practices elsewhere, as well as precedent and sensible science." (Instrument No. 92, at 27). Plaintiffs also assert that the Corps refused to use accurate government generated mapping data that according to Plaintiffs establishes many acres of wetlands within the 100–year floodplain, which would make them jurisdictional. (Id., at 28). Plaintiffs claim that the Corps' refusal to use current and accurate data is arbitrary and capricious because excessive destruction of wetlands, by itself, can preclude permit issuance and the proposed mitigation in the Bayport proposal was different for mitigating jurisdictional wetlands than for mitigating other wetlands. (Instrument No. 100, at 7).

### 4. *Failure to Approve the Least Damaging Practicable Alternative*

Under the CWA, one important question is whether an applicant's proposal provides the "least damaging practicable alternative" to accomplish the project's purposes. Plaintiffs maintain that in the Bayport ROD, the Corps found the Shoal Point alternative less damaging (No. 92,at 31). Plaintiffs contend that by excluding Shoal Point as unavailable, the Corps violated the CWA and acted arbitrarily and capriciously. (Id. at 29).

Plaintiffs also contend that they believe Pelican Island provides an additional site that is less environmentally damaging than

the Bayport location. (Instrument no. 92, at 31). Plaintiffs argue that Pelican Island is available because it is partially located on property the Port purchased in 2000. (AR 3297 at 16). Plaintiffs assert that Pelican Island offers several substantial advantages over Bayport. Pelican Island lies at the mouth of Galveston Bay, therefore Plaintiffs claim that there is no concern with deep dredging the Houston Ship Channel. Plaintiffs also argue that there is no concern for community cohesion, because only a few hundred students live (part-time) nearby. In addition, Plaintiffs assert that Pelican Island for the most part, is a dredge spoil location, therefore there are no substantial wetlands concerns. (Id.).

### 5. *Failure to Analyze Bayport and Shoal Projects Together As a Cumulative Action–Same EIS*

Plaintiffs contend that by not evaluating the two projects in the same impact statement the Corps violated NEPA. The parties agree that the Corps would be required to address the two actions in the same impact statement if the Bayport Permit and Shoal Point permit are cumulative actions. (Instrument No. 92, at 33). Plaintiffs contend that under Supreme Court caselaw, "cumulative action [means] 'when several proposals for ... actions that will have cumulative or synergistic environment impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together,' in a single EIS." Plaintiffs assert that the fact that the projects are being built and operated simultaneously, with the same purposes—to serve the Galveston Bay area—"they inescapably have numerous cumulative and synergistic impacts upon the same small region around the Galveston Bay." (Instrument No. 92, at 34). Therefore, Shoreacres asserts that two separate EIS analyses were performed for two separate permit applica-

tion "for only one 2.4 million TEU container facility. This approach—divide and disregard—defeats the purpose as well as the letter of NEPA." (Id. at 35).

Plaintiffs also assert that the Corps evaluated Bayport under the false assumption that Shoal Point remains undeveloped and used for spoils disposal rather than being developed using its permit. Shoreacres argues that the Corps imported the fatally flawed alternatives and impacts analysis from its NEPA decision into its analysis of alternatives and impacts under the CWA. Therefore, Plaintiffs surmise that the Corps could not make a properly reasoned decision that Bayport would have the least damaging environmental impact. (Instrument No. 92, at 36).

### 6. *Failing to be Consistent in its Consideration of Environmental Acceptability*

Plaintiffs argue that by refusing to evaluate Shoal Point together with Bayport, the Corp violated NEPA. The Corps permitted the Shoal Point project which includes six berths and 2.4 million TEUs in April 2003. Subsequently, in December 2003, the Corps approved the Bayport permit, allowing the construction of seven berths and 2.4 million TEUs. Plaintiffs claim that the Corps did not properly identify or analyze alternatives, because the Corps refused to acknowledge the reality that permitting Bayport with 2.4 million TEUs, in addition to Shoal Point with 2.4 million TEUs, results in 4.8 million TEU container terminal capacity to Galveston Bay.

In other words, Plaintiffs assert that the smoking gun is the arbitrary and capricious conduct of the Corps with respect to the Bayport Project, which is revealed by the fact that the Corps issued two permits to construct Bayport and Shoal Point which will conceivably result in 4.8 million

TEUs. This, Plaintiffs complain, after the Corps had already found it environmentally unacceptable to permit half that capacity at the same sites. (Instrument No. 92, at 37). Plaintiffs believe that the Corps clearly eliminated the two-site alternative (three berths at Shoal Point and four at Bayport) because of "significant adverse impacts on surface transportation, noise levels, vibration, air quality ... aquatic sediments and dredging ... and wetlands." (AR 3297, at 18–19). Plaintiffs complain that the effect of the Corps decision to permit thirteen berths and 4.8 million TEUs is devastating and doubles the size of the worst-case alternative.

Defendant Corps also filed a Motion for Summary Judgment on April 9, 2004. (Instrument No. 96). According to the Corps, the dredging of container and cruise terminal berths at Bayport would be accomplished during four phases over approximately 15 to 20 years. The Corps evaluated the permit application and determined that the proposed project would potentially have a significant environmental impact and that preparation of an Environmental Impact Statement would be necessary. In its motion, the Corps maintains that before issuing the permit for Bayport, the Corps prepared the required Final Environmental Impact Statement ("FEIS") pursuant to the requirements of the National Environmental Policy Act ("NEPA"). (AR 2385; Exh. 2). The Corps also issued a Record of Decision ("ROD"). (AR 3297; Exh. 3).

The Corps maintains that Shoreacres' allegations that the Corps' decision to issue the Bayport permit was arbitrary, capricious and inconsistent with NEPA and the CWA is without merit. The Corps asserts that it has complied fully with both statutes. Moreover, the Corps argues that its decision is fully supported by the Administrative Record. (Instrument No. 96, at 1).

The Corps contends that the state water quality standards are incorporated into all federal CWA permits, which requires each applicant to submit a certification from the state that the proposed discharge will be consistent with state water quality requirements. (Instrument No. 96, at 7). On December 16, 2003, the Executive Director of the Texas Commission on Environmental Quality ("TCEQ") issued a certification pursuant to Section 401 of the CWA confirming that the Bayport Project is consistent with state water quality standards. (AR 3299). The TCEQ also determined that Bayport is consistent with the goals and policies of the Texas Coastal Management Program. (Id.).

The Corps claims that it coordinated its review of the permit application with other resource agencies with important roles in the process. Among these agencies are the Environmental Protection Agency ("EPA"), the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), the Texas Commission on Environmental Quality ("TCEQ"), and the Texas Parks and Wildlife Department ("TPWD"). (Instrument No. 96, at 9).

The NEPA process and Section 404 evaluation extended over a period of more than five years, and federal and state agencies and the general public have had multiple opportunities to provide input to the process. (Instrument No. 96, at 9). Before issuing the permit, The Corps claims that pursuant to 33 C.F.R. Part 320.4, it conducted a public interest review of the project and applied EPA's guidelines under 33 U.S.C. § 1344(b)(1) as to Section 404 permits, and found that the project met the requirements of those regulations. (Instrument No. 96, at 9; Exh. 4).

The Corps asserts that there is a significant distinction between judicial review of the Corp's actions under NEPA and under

the CWA. (Instrument No. 96, at 10). NEPA imposes procedural, not substantive, constraints on federal agencies. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. at 227–28, 100 S.Ct. 497 (citation omitted). The Corps maintains that the Court is not empowered to substitute its judgment for that of the Corps, but is to evaluate whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *City of Alexandria v. Federal Highway Admin.,* 756 F.2d 1014, 1017 (4th Cir.1985). The Corps claims that it is entitled to particular deference with regard to factual questions involving scientific matters in its area of expertise. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

According to the Corps, it may issue a permit, it may deny a permit, or may impose conditions on a permit which would have to be accepted by the permit applicant for those conditions to become effective. (Instrument No. 96, at 13). In the case of a permit application, however, the Corps contends that it can influence the choice of a location, but ultimately cannot dictate to the applicant such a location. Rather, the Corps will decide whether or not to permit the project at the site proposed by the applicant. (Id.).

The Port, as the intervenor, also submitted a Cross–Motion for Summary Judgment (Instrument No. 94), supporting the Corps position and their process in permitting the Bayport Project. The Port claims that the Bayport Project is the least environmentally damaging practicable alternative for the construction of the Port's proposed container and cruise terminal. The Port argues that neither Shoal Point nor Pelican Island are practicable alternatives,

nor would they have less impact on the aquatic environment. (Id., at 4). The Port notes that the Fifth Circuit has explicitly held that an agency may reject any environmental concerns:

NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences.

*Sabine River Auth. v. U.S. Dep't of Interior,* 951 F.2d 669, 676 (5th Cir.1992).

Therefore, the Port contends that because compliance with NEPA is a procedural matter, the Corps is only required to consider the relevant environmental impacts. (Instrument No. 94, at 6).

Plaintiffs filed their Consolidated Response on Summary Judgment on April 15, 2004. (Instrument No. 100). In summary, Plaintiffs perceive the Corps's action as an exercise in systematic refusal to consider the most important questions: the impact of deep dredging, destruction of community cohesion, filling of wetlands, alternatives of Shoal Point and Pelican Island, and the overall impact of permitting 4.8 million TEUs. (Instrument No. 100, at 20).

In addition, Plaintiffs assert that whatever extent fiscal limits on the Port might be relevant, Plaintiffs contend that the Corps had to assess those fiscal limits. The ability of the [Port] to spend monies outside of Harris County (particularly in light of recent state legislation) needs to be investigated as part of assessing the remaining alternatives." (AR 413).

The Corps also responded to the Plaintiff's motion, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. (Instrument No. 99). The Corps contends that Shoreacres, has failed to show that it is entitled to sum-

mary judgment under the highly deferential standard of review established by the Administrative Procedures Act, 5 U.S.C. § 706. The Corps claims that all of Shoreacres' claims under NEPA are without merit and all should be rejected by this Court on the record herein. (Id., at 2). Defendants argue that all of Plaintiffs claims are without merit and are legally and factually wrong.

On April 16, 2004 the Port also filed a Reply to Plaintiffs' Cross–Motion for Summary Judgment, essentially reiterating its support of the Corps' decision making process and the Port's agreement that it was appropriate under NEPA. (Instrument No. 102). The Port also maintains that the Corps authorization of a permit to the Port was warranted under CWA. (Instrument No. 102, at 12). The Port argues that Plaintiff's dissatisfaction with the result does not translate into arbitrary and capricious action by the Corps. (Id., at 1).

The Port argues that Plaintiffs have long opposed the Bayport Project and now that they are faced with the Corps' exhaustive treatment of alternatives and impacts which are contained in the Administrative Record, Plaintiffs are essentially asking the Court to go beyond what the law requires and to review the Corps' decision *de novo*. According to the Port, Plaintiffs are unable to meaningfully attack the process under NEPA or the substantive aspects of the decision under the CWA, so they instead attack the result through selective citation of the record and comingling of the statutes. (Instrument No. 102, at 1). The Port asserts that the purpose of environmental regulation is not to create a perfect record. It is instead to ensure that the consequences of a federal action are disclosed and considered, and to protect the aquatic resources of the nation. The Port maintains that the Corps met this burden. (Id.).

## II. Standard of Review

■ "[J]udicial review of agency decisions is not whether there is a genuine issue of material fact but whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Welch v. U.S. Air Force,* 249 F.Supp.2d 797, 806 (N.D.Tex.2003). When reviewing the decision of an administrative agency, "a motion for summary judgment 'stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review.'" *Id.* at 807; *Tex. Comm. on Natural Res. v. Van Winkle,* 197 F.Supp.2d 586, 595 (N.D.Tex.2002) (*"TCONR"*).

■ Because neither NEPA nor the CWA provide an independent right of action, Plaintiffs' claims for review under NEPA and the CWA fall under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"). *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983). Under the APA, courts must uphold agency decisions unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Fifth Circuit has stressed that "[u]nder this highly deferential standard of review, a reviewing court has the 'least latitude in finding grounds for reversal'" of an agency decision and cannot substitute its judgment for that of the agency. *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 678 (5th Cir.1992).

■ This Court may only consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"—it does not reweigh the evidence. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851,

104 L.Ed.2d 377 (1989); *Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir.2002). "Thus, if the agency considers the factors and articulates a rational relationship between the facts and the choice made, its decision is not arbitrary and capricious." *Delta*, 303 F.3d at 563; *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir.1994). Indeed, the "agency's decision need not be ideal, so long as the agency gave minimal consideration to relevant facts contained in the record." *Id.*

## III. Analysis

Plaintiffs contend that in permitting the Port to build a container terminal at Bayport, the Corps violated NEPA and the CWA and have in essence scoured the record in an effort to find fault with the Corps' process and development of the FEIS.

### A. NEPA

Plaintiffs assert that the Corps erred in four respects with regard to its obligations under NEPA. Plaintiffs claim that the Corps erred by (1) failing to consider the cumulative impacts of deepening the Houston Ship Channel to a depth of fifty feet; (2) failing to consider the impacts of the Bayport Project on community cohesion and values of the neighboring areas; (3) failing to consider the Texas City project at Shoal Point together with the Bayport Project as a cumulative action; and (4) failing to find the split alternative of Shoal Point/Bayport consisting of four berths at Bayport and three at Shoal Pointas a practical alternative, but then subsequently issuing two individual permits-one for Shoal Point and one for Bayport.

 The purpose of NEPA is to concentrate the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative envi-ronmental impacts can be avoided. *See Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). NEPA's mandate is "essentially procedural ... It is to insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "Notably, the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result." *Spiller v. White*, 352 F.3d 235, 238 (5th Cir.2003). Nor does NEPA require the creation of a perfect record. 40 C.F.R. § 1500.1 ("Ultimately, of course it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.").

 With this backdrop in mind, a court may not require agencies "to elevate environmental concerns over other, admittedly legitimate considerations." *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228–228 & n. 2, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *see also Davis Mountains Trans–Pecos Heritage Ass'n v. U.S. Air Force*, 249 F.Supp.2d 763, 780 (N.D.Tex.2003) ("Congress did not require agencies to elevate environmental concerns over other appropriate considerations"); *Center for Biological Diversity v. U.S. Fish and Wildlife*, 202 F.Supp.2d 594, 649 (W.D.Tex.2002). Accordingly, courts should require full compliance with NEPA, in order that agencies will be fully aware of the impact of their decision. However, in doing so courts should not "fly speck" environmental impact statements—courts should be guided by a rule of reason. *Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309, 313 (5th Cir.1980). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Me-*

*thow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

■ NEPA requires federal agencies to consider the environmental impact of any major federal actions they undertake, and to prepare environmental impact statements ("EIS"). 42 U.S.C. § 4332(2)(c). The Fifth Circuit has set forth three criteria for determining the adequacy of an EIS:

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different causes of action.

*Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir.2000).

The Court considers these issues, bearing in mind that the agency's compliance with NEPA's procedural requirements is evaluated under a "rule of reason," pursuant to which "an EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *New York Natural Res. Def. Council, Inc. v. Kleppe,* 429 U.S. 1307, 1311, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976).

**1. *Deepening the Houston Ship Channel to Fifty Feet***

■ Plaintiffs contend that despite indications in the record that deepening the Houston Ship Channel to fifty feet is likely at some point, the Corps failed to analyze it as a cumulative impact as required by NEPA. The Port argues that the Corps rightly found that the further deepening of the channel to be too speculative to warrant treatment. (Instrument No. 94, at 19). The FEIS states:

This projected growth rate [3.3%] would provide for approximately 325,940 ship and tow transits in the Galveston Bay System by the year 2030.... In order to accommodate this projected growth rate, marine terminal facilities would have to make more efficient use of their existing facilities and space, as well as construct new facilities at ne w locations in Galveston Bay. In addition further widening/deepening of the HSC and its connecting channels would likely be necessary, as well as the construction of new channels to land areas where terminal facilities could be constructed and currently do not have ship access.

(AR 2385.11 at 4–19).

The Corps maintains that it correctly concluded that there was no need to consider a deeper Houston Ship Channel of fifty feet. In short, Defendants' assert that it is unreasonable to infer that construction of fifty foot wharves is tantamount to a plan to deepen the channel to fifty feet. *See Izaak Walton League of Am. v. Marsh* 655 F.2d 346, 374–75 (D.C.Cir.1981) (holding that additional channel capacity for one aspect of channel does not make deepening the rest of the channel foreseeable). The Port asserts that Plaintiffs' Administrative Record citation does not indicate that the construction of the Bayport Terminal will cause or necessitate further deepening of the Houston Ship Channel. (Instrument No. 102, at 4). The statement that deepening would "likely be necessary" was based on a projected overall increase of 165% in marine traffic in the Galveston Bay system by 2030. (AR 2385.11 4–19). The Port contends

that cases interpreting what is "reasonably foreseeable" have concluded that similarly remote possibilities based on projected growth do not require a cumulative impact analysis. (Instrument No. 102, at 5).

Defendants assert that there is not now and there has not been any proposal made to deepen the Houston Ship Channel to fifty feet under the 404(b)(1) guidelines, 40 C.F.R. § 230.11(g). (Instrument No. 99, at 3). This regulation requires consideration only of foreseeable cumulative impacts. The Corps also determined that the current depth of the channel was more than "sufficient for operation of the [ ] vessels that are expected to be the most common vessels calling at the proposed facility." (AR 3297 at 7). The Port argues that although the Administrative Record reflects some indication that the Corps might consider a fifty foot channel (AR 314), the Corps ultimately concluded that the distant possibility that deepening the channel may be required thirty years down the road is not a "reasonably foreseeable action" that required treatment in the Bayport FEIS. (AR 3297 at 7).

Specifically the Corps states that "[b]ecause the dredging of the Houston Ship Channel or Bayport Channel has not been proposed, much less studied, it is entirely speculative.... [therefore] NEPA does not require the Corps to address this issue." (Instrument No. 96, at 21). For the reasons given, the Corps argues that the project is speculative, not foreseeable. Accordingly, the Corps and the Port argue that this determination was not arbitrary and capricious. (Instrument No. 94, at 23).

While NEPA requires analysis of "reasonably foreseeable" impacts, 40 C.F.R. § 1508.7, it does not mandate consideration of speculative risks or impacts. *See, e.g., Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 680 (5th Cir.1992). Plaintiffs cite *TCONR* in support of their claim that further dredging of the Houston Ship Channel must be analyzed in the Bayport EIS. *See Tex. Comm. on Natural Res. v. Van Winkle,* 197 F.Supp.2d 586, 617 (N.D.Tex.2002). The court in *TCONR* held that "even if a foreseeable, future action is not a proposed action such that it does not need to be analyzed and decided in the same EIS, the cumulative impacts of this foreseeable action nevertheless must be analyzed in the EIS." *See Tex. Comm. on Natural Res. v. Van Winkle,* 197 F.Supp.2d 586, 617 (N.D.Tex.2002). However, the facts in *TCONR* are very different than the facts the Court has in the present case. In *TCONR,* the financing for the "foreseeable future actions" was passed by voters in a bond election eleven years prior to the publishing of the EIS. In addition, there were several studies recommending the action and the implementation of the projects only required approval by the Corps before construction could begin. *See id.,* at 619. Therefore the court found that the projects were "reasonably foreseeable future actions" and must me analyzed in the Corps' EIS. *Id.*

In this case, there is no plan or proposal to deepen the channel to fifty feet, *Air Liquide Am. Corp. v. United States Army Corps of Eng'rs,* 359 F.3d 358, 366 (5th Cir.2004) such action would require congressional authorization. There is only a suggestion in the record that long-range projections of ship traffic in the area would make this, and other significant resource-intensive developments, likely by the year 2030, which is beyond the Corps' stated planning horizon. (AR 2385.11 at 4–19; AR 310 at 16). The Bayport Project, however, would not create a necessity for deepening the channel, only constituting 1.6–1.8% of this projected growth. (AR 320; AR 2385.11 at 4–19). The record also indicates that the cost involved does not justify deepening the channel at this time.

(AR 310 at 4). The Corps also concluded that the current depth was more than "sufficient for operation of the Panamax vessels that are expected to be the most common vessels calling at the proposed facilities." (AR 3297 at 7). Taking this all into consideration, the Corps declined to analyze further deepening of the channel, noting that "[i]t is not appropriate to include such speculative actions in the EIS for this permit application." (AR 3297 at 119).

Plaintiffs also point to the fact that the Bayport wharf foundation docks are designed, if needed, to accommodate a future channel depth of fifty feet. This, however, is consistent with the Port's 30–year practice of designing wharves to accommodate depths of 5 feet greater than the federally authorized depth of the Houston Ship Channel. The Corps explained this feature was reasonable to anticipate future increased capacity, focusing on the fact that the Bayport terminal was expected to have an operational life span of at least fifty years. (AR 3297 at 7, 118–19). Plaintiffs' argument in this regard is essentially that because the Port has the capacity to accommodate depths of fifty feet, it indicates that such action is reasonably foreseeable. The Court disagrees. *See Izaak Walton League of Am. v. Marsh,* 655 F.2d 346, 374–75 (D.C.Cir. 1981).

Courts considering even shorter-term projects and predictions than those at issue here have found them not to be "reasonably foreseeable." *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1173 (10th Cir.2002) (study predicting traffic growth in 15 and 20 years too distant to require cumulative impact analysis); *Village of Grand View v. Skinner,* 947 F.2d 651, 659 (2d Cir.1991) (study indicating a need for further development in 20 years too distant); *Neighbors Organized to Insure a Sound Environment,*

*Inc. v. Engen,* 665 F.Supp. 537, 545 (M.D.Tenn.1987) (study on need for project in 10 years too distant to be meaningfully evaluated), *vacated as moot,* 878 F.2d 174 (6th Cir.1989) (case moot because construction completed pending appeal); *Communities, Inc. v. Busey,* 956 F.2d 619, 626 (6th Cir.1992) (proposed reconstruction in 10 years too distant to be cumulative impact); *Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1181–82 (9th Cir.1990) (study of activity beyond 5 year plan not reasonably foreseeable for cumulative impacts analysis); *Town of Cave Creek v. FAA,* 325 F.3d 320, 331 (D.C.Cir.2003) (projection of noise effects 5 years out too speculative). This is even true where the project was actually planned, but not scheduled to be completed for some time. *See Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 428 (10th Cir.1996). Accordingly, given the speculative nature of further dredging, the Court cannot conclude that the Corps was arbitrary or capricious in declining to consider the impact of dredging to depths of fifty feet in the FEIS.

### 2. *Impacts on the Surrounding Community*

■ Plaintiffs claim that the Corps specifically failed to make an analysis of the issue of "community cohesion." This specific quibble relates to the manner in which Plaintiffs versus Defendants define "community cohesion." The Defendants respond by asserting that the Corps disclosed and considered possible impacts on area communities and that Plaintiffs are attempting to turn the Corps into a regional land planner. (Instrument No. 94, at 23). In addition, the Corps claims that it fully and carefully considered effects and impacts on local land use. (Instrument No. 99, at 3). Defendants contend that the Corps' obligation under NEPA was not to make a decision based on such effects, but

only to disclose those effects, prior to making a decision. The Corps claims it clearly did meet those requirements, as the Administrative Record reflects. (Id.).

According to the Port, the Corps' analysis adequately disclosed air pollution impacts and included conditions to limit impacts. (AR 3297 at 89–90). The Corps' analysis also adequately disclosed fugitive dust emissions, which are covered by significant permit conditions. (AR 3297 at 89–90 and 127). The Corps claims that it paid close attention to noise-related impacts attributable to the Bayport Project and disclosed those impacts and imposed conditions. (AR 3297 at 38–44 and 120). According to the Port, Plaintiffs improperly attempt to cast the Corps into the role of a land use planner. The Port and the Corps support the contention that the Corps should consider economic or social effect on the human environment, they also contend that caselaw supports the assertion that these economic and social impacts are of lesser importance in an EIS than purely environment or ecological concerns. (Instrument No. 94, at 26).

The Corps determined that the land used for the Bayport project "had been designated for industrial development for many years." (AR 3297 at 32). Thus, the Corps found relatively minimal land use impacts arising out of the Port's industrial use of their property in an otherwise predominantly industrial area. (AR 3297 at 32–40, 120). The Corps also looked at surrounding areas and determined that the Bayport Project would have minimal effect on the land use development of the nearby municipalities. (AR 3297 at 32–33). However, the Port did evaluate the potential diminution of residential property values and acknowledged that some residential property values might decline. However, such diminution of values was not subject to precise quantitative calculation. (AR 3297 at 119, 23, 35). Defendants also con-

tend that the Corps' consideration of human impacts is entitled to deference and that the Corps complied with NEPA.

 NEPA provides for consideration of the economic or social effects on the human environment in evaluating a permit application. *See* 40 C.F.R. § 1508.14. NEPA requires "a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement." *Welch,* 249 F.Supp.2d at 827; *see also Sierra Club v. Sigler,* 695 F.2d 957, 974–75 (5th Cir.1983). These economic and social impacts, however, "clearly occupy a lesser tier of importance in an EIS than do purely environmental or ecological concerns." *Welch,* 249 F.Supp.2d at 827. The Fifth Circuit has long held that "[d]etermination of economic benefits and costs that are tangential to environmental consequences are within th[e] wide area of agency discretion." *S. La. Envtl. Council, Inc. v. Sand,* 629 F.2d 1005, 1011 (5th Cir.1980).

The Corps identified many topics that were important to its decision, including roadway traffic, air quality, noise, public safety, social effects, such as population increases and division of existing communities, navigation and boating recreation, dredged material management, water quality, and terrestrial and aquatic biotic communities. (AR 3297 at 3). The Corps went on to detail these impacts. (AR 3297 at 32–64).

Plaintiffs claim, however, that the EIS did not analyze what its findings mean with regard to land use patterns within the cities surrounding Bayport, in other words, to conduct a "community cohesion" analysis. The cases discussing a community cohesion analysis are primarily in the federal highway project context. *See, e.g., Rothrock v. U.S.,* 62 F.3d 196, 199 (7th Cir.1995); *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1461–62 (9th Cir.1984). Never-

theless, although the Corps' discussion of the effects of the Bayport Project on the surrounding communities in the FEIS and the ROD was not entitled "community cohesion," the Court finds that the Corps analyzed the factors that would logically be included in a discussion of community impact or "community cohesion."

The Corps extensively discussed potential impacts on "land use and coastal zone management," "socioeconomic," and "social characteristics and environmental justice" with respect to the various affected municipalities. (AR 3297 at 32–34). Finding that land to be used for the Bayport Project "had been designated for industrial development for many years", the Corps found relatively minimal land use and socioeconomic impacts arising out the industrial use of this predominantly industrial property. (AR 3297 at 32, 120; Shoal Point ROD at 10–11). Indeed, no residences or businesses would be displaced by the Bayport Project. (AR 2385.10 § 3.4.3.3 at 3.4–13). In response to these municipalities' comments that the project would affect local residents and community values, the Corps catalogued and responded to these municipalities' diverse and voluminous comments in Section 3.4 and Appendix 6.2 of the FEIS. (AR 3297 at 34). The Court declines Plaintiffs' invitation to cast the Corps as a regional land use planner by requiring more than this. *See Isle of Hope Historical Ass'n v. United States Army Corps of Eng'rs,* 646 F.2d 215, 221 (5th Cir.1981) (holding that, with respect to land use analysis, "[t]he EIS was not intended to be a substitute community planning device"). Accordingly, the Court cannot conclude that the Corps violated NEPA in their treatment or analysis of impacts to the human environment.

### 3. *Treatment of Shoal Point and Bayport as a Cumulative Action*

■ Plaintiffs argue that the Corps' failure to prepare a single EIS for the Shoal Point and Bayport projects violates NEPA. Defendants respond that NEPA only required the Corps to consider the cumulative effects of both permits in the Bayport EIS, which it did.

In the course of the NEPA process, a total of 78 preliminary sites were identified. Through a three-tiered process using eight evaluation criteria, these sites were narrowed to six potential alternative locations. (AR 3297 at 12). Approximately one month prior to the release of the FEIS for the proposed Bayport project, the Corps issued a separate permit to construct a container facility at Shoal Point, a separate project in Texas City, Texas with no connection to the Bayport project other than the fact that it also would allow construction of marine transportation facilities. (AR 3297 at 3).

The Corps claims that it was not engaged in deciding how to provide or authorize any particular level of port capacity in the Galveston Bay area. (Instrument No. 96, at 14). Accordingly, the Corps contends that Shoreacres' arguments regarding the amount of capacity needed for port facilities in the same area are based on a fundamental misunderstanding of what the Corps was reviewing and analyzing. The Corps was not making any decision based on an assumed ceiling or limit on port capacities in the area. (Id., at 14).

In the case at bar, the Corps maintains that it made an informed decision that the two container permits were better addressed in separate impact statements. (Id., at 16). "The determination of when various projects in an area are sufficiently concrete and closely related so as to require the filing of a single comprehensive EIS is a difficult one, 'properly left to the informed discretion of the responsible federal agency.'" *Friends of the River v. FERC,* 720 F.2d 93, 104 n. 21 (D.C.Cir. 1983) (quoting *Kleppe v. Sierra Club,* 427

U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). The Corps determined that a combined FEIS was unnecessary because the Bayport FEIS contained an assessment both of the project itself and the secondary and cumulative effects of the relevant activities. (AR 3297 at 107). In short, according to the Corps, the Bayport FEIS addressed the cumulative impacts of all reasonably foreseeable projects, including the Shoal Point permit. (Instrument No. 96, at 17). The Corps argues that it reasonably concluded that two separate review documents were the best way to assess the combined impact of the two separate permit proposals, therefore, this decision was not arbitrary. (Id., at 17).

The Corps asserts that Shoreacres erroneously suggests that the Bayport FEIS does not consider the impact of the total development of both the Bayport and Shoal Point permits. (Instrument No. 1, at 109–17). In fact, both the Bayport FEIS and ROD and the Shoal Point FEIS and ROD include the assumption that both facilities may be built and each addressed the impacts the other project would have. (Id.). According to the Corps, both the Bayport FEIS and ROD and the Shoal Point FEIS and ROD fully satisfy the requirement that cumulative effects of projects be analyzed. (Id.).

Defendant Intervenor Port maintains that the Corps did not abuse its discretion by addressing the Shoal Point project as a cumulative impact instead of permitting the Shoal Point and Bayport projects together under a single EIS. In this case, the Corps decided to permit the Bayport Project and Shoal Point separately and discuss both projects as cumulative impacts. The Port claims that this decision does not violate NEPA. (Instrument No. 94, at 7). The Port contends that NEPA projects are not "connected" if they could exist independently of each other. 40 C.F.R. § 1508.25(a)(1). In addition, the

Port notes that Plaintiffs do no not provide the Court with any NEPA authority invalidating an agency decision to analyze permit application separately where the other project was thoroughly considered as a cumulative impact. (Id., at 9).

The Port contends that throughout Plaintiffs complaint and motion for summary judgment, Plaintiffs are impermissibly questioning the result. Further, the Port argues, that underlying Plaintiffs' focus on the greater impacts for the split alternative is a veiled and result oriented challenge to the need for both the Bayport and Shoal Point projects. The Port counters, noting that based on the forecasting, the Corps made an explicit determination that both the Bayport and Shoal Point projects would be needed to meet forecasted growth of demand for containerized cargo operations:

> Studies performed through the Texas Transportation Institute (TTI) predict a continued worldwide container movement growth rate ... along the Gulf of Mexico coast ... up to 29 new container berths could be needed in the Texas Central Gulf Region between 2001 and 2028. A permit has been issued for a proposed six-berth terminal at Shoal Point, but the overall projected need for additional container terminal facilities indicates that both facilities may be needed in the future.

(AR 3297 at 10).

The Port asserts that the Corps considered the cumulative impact from Shoal Point-even assuming the construction of Shoal Point as part of the no-action alternative. The Corps repeatedly recognized the Shoal Point project throughout the ROD. (AR 3297 at 3, 10, 14, 16, 19, 11, 112). The Shoal Point Project was permitted in late March 2003, with its authorization finalized in late April 2003 at the same time as the Bayport FEIS was in publica-

tion. Thus, the Bayport FEIS did state that "Shoal Point—remains a dredged materials PA [Placement Area]." (AR 2385.10 at 2–15). However, in the ROD the Corps did observe that although the project was permitted, it was not certain to occur, nevertheless, the Corps carried Shoal Point forward as an alternative site for the Bayport Project. (AR 3297 at 111; AR 3297 at 3). In addition, the Corps considered the Shoal Point facility as a cumulative impact. (AR 32097 at 111). In fact, the Port contends that the Corps concluded in the FEIS that the Bayport and Shoal Point projects were so far apart geographically that there would be no cumulative effects with respect to noise, vibration, aesthetics, cultural resources, parks and recreation. (Instrument No. 94, at 18).

NEPA requires federal agencies to prepare an EIS for all major federal actions significantly affecting the human environment. 42 U.S.C. § 4332(c). NEPA regulations require the Corps to consider three types of actions in determining the scope of an environmental impact statement: (1) connected actions, which "are closely related and therefore should be discussed in the same impact statement"; (2) cumulative actions, "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"; and (3) similar actions, "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a) (2004). The regulations explicitly exclude "unconnected single actions" from the list of actions that must be considered together in a single EIS. 40 C.F.R. § 1508.25(a)(2). Here, the Corps concluded that Bayport and Shoal Point were unconnected single actions.

Because the Corps has discretion whether to consider "similar" actions in the same impact statement, 40 C.F.R. § 1508.25(a)(3), the Corps would be required to address Shoal Point and Bayport in the same EIS only if the two actions are "connected" or "cumulative" actions. *See Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1304 (9th Cir.2003).

As Defendants note, the Bayport permit and the Shoal Point permit were two separate proposals by two different applicants for two separate facilities, with different purposes and needs. (Instrument No. 96, at 16). Each has its own independent utility and is not interdependent or conditional on the other. The fact that both applications were pending concurrently does not, on its own, require the Corps to treat them in a single EIS. *See* 40 C.F.R. § 1508.25(a)(2). The Bayport application includes a terminal for cruise ships, whereas the Shoal Point facility does not. Acceptable alternatives for one facility would not be acceptable for the other facility. The Bayport Rule of Decision noted that the facilities are entirely unrelated. (AR 3297 at 111–112). Plaintiffs have not alleged or shown that the Corps chose to treat the permit applications in separate EISs to minimize the possible cumulative impacts to the environment.

Plaintiffs have also not shown that the Bayport and Shoal Point projects are "connected" under NEPA. The regulations provide that projects are not "connected" if they could exist independently from one another. 40 C.F.R. § 1508.25(a)(1). As the AR 3297 indicates, Bayport and Shoal Point do not depend on one another to exist and have their own independent utility. *See Enos v. Marsh*, 769 F.2d 1363, 1371 (9th Cir.1985).

■ Whether the Bayport and Shoal Point projects should be considered "cumulative actions" under the regulations re-

quires additional analysis. Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). NEPA "places discernible limits on which projects must be considered together for their cumulative impact." *Clairton Sportsmen's Club v. Pa. Tpk. Comm'n*, 882 F.Supp. 455, 469 (W.D.Pa.1995). The need for a consolidated environmental impact statement depends on the facts with the focus being whether the actions are essentially independent or interdependent and whether each action involves an irrevocable commitment of resources. *See Minn. Pub. Interest Research Group v. Butz*, 541 F.2d 1292, 1306 (8th Cir.1976). The court in *Welch* found that when agency actions are independent, comprehensive cumulative impact statements are not required. *See Welch v. United States Air Force*, 249 F.Supp.2d 797, 824 (N.D.Tex.2003); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895 (9th Cir.2002). Those same facts apply in this case. The Shoal Point and Bayport project proposals are independent of each other, proposed by different entities and the Corps has made the decision to approve them separately over a period of time. Moreover, there is no indication in the record that the Corps has intentionally tried to segment review of the projects so as to minimize their seeming cumulative impact.

Further, the cumulative effects analysis in the EIS demonstrates that the Bayport and Shoal Point projects had generally minimal cumulative impacts on the environment. (AR 2385.11 at 4–10–4–31). It is Plaintiffs' position that if they were in charge, they would have analyzed the projects in the same EIS, while the Corps disagrees. Based on the factors analyzed in the FEIS and ROD the Court cannot find on the record before it that the Bayport and Shoal Point projects are cumulative actions under Section 1508.25(a)(2) so

as to require their consideration together in a single NEPA review document. *Native Ecosystems*, 304 F.3d at 895.

While Bayport and Shoal Point have certain cumulative impacts, the Corps analyzed these cumulative impacts in the Bayport FEIS, which was within its discretion. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Welch*, 249 F.Supp.2d at 824. "[A]s long as the agency performs the necessary depth of analysis, the choice between a programmatic and a site-specific [EIS] is within the agency's discretion." *United States v. 162.20 Acres*, 733 F.2d 377, 381 (5th Cir.1984); *Welch*, 249 F.Supp.2d at 824. Indeed, as long as the cumulative impacts of the other proposed action are discussed in the EIS, an agency determination not to conduct a comprehensive EIS for multiple projects is not arbitrary and capricious. *See Kleppe*, 427 U.S. at 415 n. 26, 96 S.Ct. 2718.

In keeping with its responsibilities under NEPA, the Corps analyzed the impacts of the Shoal Point project in the Bayport EIS. Specifically, the Corps conducted a cumulative impacts study, which took "into consideration a number of identified past, present, and future activities that may occur in the Galveston Bay area, including the proposed development of a new container terminal complex at Shoal Point." (AR 3297 at 111). The Bayport EIS also includes the public comments on this topic. (AR 3297 at 81, 84, 89, 95, 97, 101, 102, 107). The Corps considered these comments and responded to them, which satisfies its duty under NEPA. *See Mississippi River Basin*, 230 F.3d at 176.

Plaintiffs have identified no authority, and the Court could find none, invalidating agency action under NEPA for the failure to treat projects in a single EIS where the agency had included evaluation of the other proposed action as part of its cumula-

tive impact analysis. Plaintiffs' complaints simply "fly speck" the Corps analysis, but it is clear that the Corps' evaluation complied with the goals of NEPA, which is to require the agency to take a "hard look" at the environmental consequences. *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835.

The Bayport EIS and Record of Decision include the assumption that both facilities may be built and each addressed the impacts that the other project would have. As a result, the Court cannot conclude that the Corps decision to treat Shoal Point and Bayport as unconnected single actions was arbitrary and capricious.

The Court notes that Plaintiffs' Motion treats the Shoal Point and Bayport projects as competing permit applications. Plaintiffs argue that once Shoal Point was permitted the Corps should have denied the Bayport Project's application, because they are "being built and operated simultaneously, with the same purposes to serve the Galveston Bay area." (Instrument No. 92, at 34 and 38–39). Further, Plaintiffs inexplicably argue that the Corps was obligated to do an analysis on the alternative of developing 4.8 TEUs on a single site, as an alternative to developing such capacity at two or more sites, even though the Port's application was for 2.4 TEUs at one site. (Instrument No. 92 at 34).

There is no evidence or legal basis for the idea that NEPA or CWA obligated the Corps to place an arbitrary ceiling on the number of TEUs passing through the area or that the two projects were competing with one another. The only requirement is that the Corps consider the cumulative impact of the Shoal Point project in the Bayport FEIS. *See Tex. Comm. on Natural Res. v. Van Winkle,* 197 F.Supp.2d 586, 597 (N.D.Tex.2002); (AR 2385.11 at 4–14; 4–17; 4–18). The Court finds that the Corps met that requirement, consequently, the Corps has not violated NEPA in regard to its examination of the cumulative

impact of Shoal Point in the Bayport FEIS.

### 4. *The Decision to Issue Individual Permits for Bayport and Shoal Point*

Plaintiffs claim that it was error for the Corps to have permitted both the Shoal Point and Bayport projects, because the Corps had previously eliminated the (four berths at Bayport plus three berths at Shoal Point) split alternative it considered in the Bayport EIS. The Port claims that the low rank given the split location is the result of the inherently greater impacts of building one project with two facilities at two locations which must then be linked so they operate as one, rather than confining the project to a more efficient single location. (AR 3297 at 92).

The Corps stated that:

Development of this alternative would require construction or improvement of infrastructure such as navigation access, roadways, and utilities at two locations rather than at a single location, possibly increasing development costs and environmental impacts associated with those improvements.

(AR 3297 at 17).

The FEIS detailed the various problems inherent with the split alternatives:

● Development of basic support infrastructure at three locations would be required,

● Each would fragment port operations to an extent that would render them financially impractical, and

● They would likely result in greater overall environmental impacts than alternatives with comparable cargo capacity developed at other locations.

(AR 2385.10 at 2–13).

In considering the Port's Bayport Project application, the Corps rejected the

Shoal Point/Bayport split alternative. The Corps found that development of the split alternative "would require construction or improvement of infrastructure such as navigation access, roadways, and utilities at two locations rather than at a single location, possibly increasing development costs and environmental impacts associated with those improvements", consequently the Corps removed the Shoal Point Bayport Split alternative from consideration. (AR 3297 at 17 and 27).

Texas City also submitted a separate project application to the Corps for a terminal at Shoal Point, which the Corps granted. Plaintiffs claim that approving the Bayport Project was error when the Texas City Shoal Point project had been approved, because the Corps had rejected the split location alternative in analyzing the Bayport application. Additionally, Plaintiffs claim that the Corps failure to analyze an alternative consisting of the total capacity of Bayport and Shoal Point located at Shoal Point violates NEPA. (Instrument No. 92, at 34).

Both arguments misconstrue the Corps' role and attempt to cast it as a regional land use planner, *Isle of Hope Historical Ass'n v. United States Army Corps of Eng'rs*, 646 F.2d 215, 221 (5th Cir.1981). Simply because a split alternative for one project was rejected because linking the two sites would create undesirable environmental impacts does not mean that separate projects cannot be permitted if demand exists and the applicants have complied with the requirements for receiving a permit.

The Corps is required to give substantial weight to the needs of the applicant in considering alternatives. *See also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir.2002). The Port's proposal was for 2.4 TEUs in one location. Accordingly in the context of review of the Port's application

it was not necessary for the Corps to analyze the construction of 4.8 TEUs. However, the Corps did analyze the cumulative impact of having 4.8 TEUs in operation at both Shoal Point and Bayport, (AR 2385.11 4–12—4–31) which is what NEPA requires. The Corps, through the "EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *New York Natural Res. Def. Council, Inc. v. Kleppe*, 429 U.S. 1307, 1311, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976). Accordingly, the Court finds that the Corps did not violate NEPA by rejecting the Shoal Point/Bayport split alternative, but subsequently permitting the projects individually, without analyzing a 4.8 TEU alternative project at one site.

## IV. Clean Water Act

Plaintiffs assert four violations of Section 404 of the Clean Water Act: (1) the Corps' failure to analyze the cumulative impact of deepening the channel to fifty feet; (2) the Corps' delineation of only 19.7 acres of wetlands; (3) the Corps' erroneous determination that Shoal Point was not a practicable alternative; and (4) the Corps' determination that Pelican Island was not the least damaging practicable alternative location.

Unlike NEPA, the Clean Water Act ("CWA") is a pollution control statute that sets forth substantive requirements. The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a). The CWA

defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands. 33 C.F.R. § 328.3(a)-(b). The Corps must make a determination of whether and to what extent "waters of the United States" are affected by the proposed project.[3] This process is known as a "wetlands delineation" or a "jurisdictional determination."

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into wetlands through permitting. *See* 33 U.S.C. § 1344. In addition to passing a public interest review which balances reasonably expected benefits against reasonably foreseeable detriments, all CWA section 404 permits must meet guidelines issued by the Environmental Protection Agency and the Corps under CWA section 404(b)(1). *See* 33 C.F.R. § 320.4(a); 33 U.S.C. §§ 1344(b)(1), 1344(e)(1). These "404(b)(1) Guidelines" specify that the Corps must ensure that the proposed fill will not cause significantly adverse effects on human health or welfare, aquatic life, and aquatic ecosystems. 40 C.F.R. pt. 230.10(c)(1)-(3). To comply with this requirement, the Corps must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment." *Id.* § 230.11.

The 404(b)(1) Guidelines also provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). Mitigation, which consists of steps to avoid or minimize effects of a proposed activity or compensating for the effects by providing resources as a substitute for the impacted area, is one way to reduce potential adverse impacts of a project.

The Guidelines do not generally allow the permitting of projects where there is "a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

## A. Analysis of Cumulative Impacts Under Section 404

 Plaintiffs contend that the Corps erred in failing to analyze the impact of deepening the Houston Ship Channel to fifty feet. Under the CWA, the Corps is required to predict the cumulative effects attributable to the discharge of dredged or fill material in jurisdictional waters "to the extent reasonable and practical." *See* 40 C.F.R. § 230.11(g)(1). This is a narrower test than the "reasonably foreseeable" threshold under NEPA for analysis of cumulative impacts. *Utahns for Better Transp. v. United States Dep't of Transp.,* 305 F.3d 1152, 1191 (10th Cir.2002). Given that the Court has found that dredging the channel to a depth of fifty feet is not "reasonably foreseeable" under NEPA, the Court concludes that it was not reasonable or practical to make a prediction about the

---

**3.** *See e.g.* 33 C.F.R. § 328.3 (defining "waters of the United States" under the Corps' regulations). The term "waters of the United States" includes wetlands. *Id.* § 328.3(a)(3). Wetlands are "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil condition." *Id.* § 328.3(b).

impact of future dredging. Accordingly, the Corps was not arbitrary or capricious in failing to analyze the potential effects of dredging the channel to fifty feet.

## B. Wetlands Delineation

■ The Corps and the EPA acknowledge that there will be discharges of dredged or fill material into the wetlands at each of the considered sites. (AR 3297 at 13–17). The Bayport permit authorizes the Port Authority to fill a limited amount of wetlands subject to federal jurisdiction in order to construct a marine cargo container and cruise terminal project on 1,043 acres along the north and south sides of the Bayport Ship Channel ("the Bayport Site" or "Site"). (Instrument No. 96, at 1). A Corps-approved wetland delineation verified that the project site contains approximately 19.7 acres of jurisdictional wetlands, 126.7 acres of non-jurisdictional wetlands, and 1.56 acres of intertidal mudflats. (AR 3297 at 2). Plaintiffs contend that 146 acres of wetlands, rather than the 19.7 acres delineated by the Corps, are jurisdictional wetlands and subject to CWA protection.[4] Therefore, the parties dispute the number of acres of wetlands that fall within the Corps' jurisdiction.

The Corps claims that resolution of the dispute over the number of jurisdictional wetlands is not essential for the Court's decision in this proceeding, even if, as Shoreacres contends, the site contains 146 acres of jurisdictional wetlands:

> [e]ven assuming that all wetlands and other aquatic areas on Bayport site were jurisdictional, which is not the case, the mitigation provided by the [Port], involving over 1,130 acres of wetlands and other habitat adequately compensates

for environmental impacts as evidenced by the acceptance of this plan by the resource agencies.... Issuance of the proposed permit would still be appropriate under all applicable laws and regulations even if all aquatic areas on the project site were subject to CWA jurisdiction.

(AR 3297 at 110).

The Corps specifically found that there will be a significant adverse impact on the wetlands at Bayport and each of the alternative sites. (AR 3297 at Table 3). Therefore, Section 404(b)(1) of the Guidelines requires "[a]ppropriate and practical compensatory mitigation ... for unavoidable adverse impacts which remain after all appropriate and practicable minimization has been required." 40 C.F.R. § 230.10(d); (Instrument No. 97, Exh. 5, at 3); *see also Municipality of Anchorage v. United States*, 980 F.2d 1320, 1322 (9th Cir.1992) (describing the EPA–Corps MOA as "setting forth the policy and procedures to be used in determining the type and level of mitigation that would be required to comply with section 404(b)(1) guidelines."). Compensating for resources losses, or mitigation, "is an important aspect of the review and balancing process or many ... permit applications." 33 C.F.R. § 320(4)(r)(1). As Section 404(b)(1) Guidelines require "[a]ppropriate and practical compensatory mitigation ... for unavoidable adverse impacts which remain after all appropriate and practicable minimization has been required." (Instrument No. 96 at Exh. 5—EPA and Corps Memorandum of Agreement ("MOA")); *see also Municipality of Anchorage v. United States*, 980 F.2d 1320, 1322 (9th Cir.1992) (describing the EPA–Corps MOA as "set-

---

4. Plaintiffs also complain that the Corps failed to consider their interpretation of Harris County floodplain data. Given that the Corps instead used appropriate standard federal sources such as the Federal Emergency Management Agency (FEMA) maps, and there is no suggestion that they are erroneous, the Court fails to see how this is a cognizable injury under the CWA.

ting forth the policy and procedures to be used in determining the type and level of mitigation that would be required to comply with section 404(b)(1) guidelines.").

According to the Corps, the Bayport Permit requires the Port to provide a very substantial amount of mitigation to compensate for these losses. The Corps' contends that its conclusion that these mitigation requirements would be sufficient even if there were 146 acres of jurisdictional wetlands at the Site is supported by statements of the federal and state resource agencies that are included in the Administrative Record. The ROD states that the Environmental Protection Agency and the Fish and Wildlife Service, as well as the Texas Parks and Wildlife Department have indicated that the final mitigation plan "appropriately compensates for projected impacts to fish and wildlife resources." (AR 3297 at 111). The mitigation efforts include wetlands creation, wetlands enhancement, prairie enhancement, and uplands preservation at the 174–acre Memorial Tract adjacent to Armand Bayou, preservation of the 456–acre Banana Bend Tract on the San Jacinto River, and preservation of 500 acres of coastal prairie within the Cypress Creek watershed. (AR 3297 at 8–9). The Corps considered the types of wetlands at the Bayport site, their value, and the functions they perform, and performed a similar analysis for the mitigation. FEIS at 3.19–7 thru 3.19–12, 3.19–16 thru 3.19–18.

As a result, the Corps concluded that "issuance of the proposed permit would still be appropriate under all applicable laws and regulations even if all aquatic areas on the project site were subject to CWA jurisdiction." (AR 3297 at 110).

The Corps' approach has been ratified by the Environmental Protection Agency, the Fish and Wildlife Service, as well as the Texas Parks and Wildlife Department. (AR 3297 at 111). The Texas Commission on Environmental Quality concluded that the mitigation "compensates for the lost water quality functions of 126.7 acres of hydrologically isolated wetlands in the U.S. and provides important water quality functions." (AR 3297 at 109–111); *see also Airport Communities Coalition v. Graves*, 280 F.Supp.2d 1207, 1219–20 (W.D.Wa. 2003) (Corps found environmental impacts insignificant "in light of various mitigation measures."). In the EPA's September 12, 2003 letter to the Corps, it also agreed that the proposed mitigation would "satisfactorily provide compensation for [the] valuable wetlands and coastal prairie habitat" that would be destroyed in the development of the Bayport Project. (AR 3243).

Plaintiffs also fault the Corps for refusing to consider "overland sheet flow," rainfall that flows over land, but not in a discernable channel, in determining whether certain Bayport wetlands were jurisdictional. The Corps explained that a connection caused solely by overland sheet flow due to rainfall is an overly broad interpretation of the CWA. (AR 2385.16 at 212).

■■■ The Corps is entitled to significant deference regarding its wetlands delineation. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). The Administrative Record confirms that the Corps analyzed comparable decisions in making its ROD determination regarding the delineation of jurisdictional wetlands.[5] The jurisdictional determina-

---

**5.** The Supreme Court has recently held that migratory bird usage is not a sufficient basis for CWA jurisdiction over isolated, non-navigable intrastate waters, which makes up much of the area at issue. *See Solid Waste* *Agency of Northern Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001); (AR 3297 at 56–58, FEIS at 3.19–1 thru 3.19–20).

tion under the CWA is a highly technical decision within the expertise of the Corps and it is entitled to substantial deference. *See id.,* at 906; *see also Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (finding that the resolution of issues requiring a high level of technical expertise is properly left to the informed discretion of the responsible federal agencies.). Moreover, the Corps definitively stated that even if all 146 acres of wetlands were considered jurisdictional, the Bayport Project's proposed mitigation would be sufficient to allow the Corps to approve the permit. Accordingly, the Court cannot conclude that the Corps' wetlands delineation of 19.7 acres was arbitrary or capricious.

### C. Shoal Point and Pelican Island as Practicable Alternatives

The CWA Guidelines generally prohibit the permitting of projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.0(a); *see also* 33 C.F.R. § 320.4(a)(2)(ii). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

Shoreacres alleges that the Corps acted arbitrarily in concluding that Pelican Is-

land was not a less damaging practicable alternative to the Bayport Site. (Instrument No. 1, at 145–53). In the Bayport ROD, the Corps concluded that the alternative sites, including Bayport and Pelican Island, "are relatively close when comparing and evaluating the projected impacts to the existing environment." (AR 3297 at 19). The Corps also identified several areas where Pelican Island would have a greater adverse impact than the Bayport Site. (Id. at 26–27).

▉ Plaintiffs contend that the Corps failed to fully consider two alternative sites, Shoal Point and Pelican Island. Defendants respond that the alternatives posed by Plaintiffs were either impracticable or unavailable.

The 404(b) Guidelines prohibit permitting projects where there "is a practicable alternative to the proposed discharge that would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a); *see also* 33 C.F.R. § 320.4(a)(2)(ii). "Practicable" means that an alternative is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Additionally, "if it is *otherwise* a practicable alternative, an area not presently owned by the applicant which could *reasonably* be obtained, utilized, expanded or managed in order to

---

As the Fifth Circuit has held, the reach of "navigable waters" under the CWA only extends to a body of water that is "actually navigable or is adjacent to an open body of navigable water." *Rice v. Harken,* 250 F.3d 264, 268 (5th Cir.2001). In other words, the CWA does not extend to waters that are neither navigable waters nor truly adjacent to navigable waters. *In re Needham,* 354 F.3d 340, 345 (5th Cir.2003) (noting "in this circuit the United States may not simply impose reg-

ulation over puddles, sewers, roadside ditches and the like."). Thus, in the Fifth Circuit, controlling authority holds that the CWA does not cover waters that are isolated or separated from a navigable body of water, such as these. (AR 3297 at 57) (characterizing the remaining wetlands as "isolated, depressional wetlands, occurring both within upland/wetland mosaics and as individual isolated depressions.").

fulfill the basic purpose of the proposed activity may be considered." *Id.* (emphasis added).

### 1. *Shoal Point*

Plaintiffs argue that Shoal Point is a practicable alternative under the 404(b)(1) guidelines. Plaintiffs cite *Bersani v. United States EPA*, 674 F.Supp. 405, 411 (N.D.N.Y.1987) in support of their contention that Shoal Point location must be considered "available." In *Bersani*, it was the EPA that argued that the Corps failed to consider an alternative "available." The Corps and the EPA disagreed about whether an alternative was "available" only if it was "presently available"—available at the time the agency makes its decision or should the "availability determination" focus on the point in time when the applicant actually examined the alternatives. *Id.*, at 418. That is not the crux of the disagreement between the parties in this case. In this case Plaintiffs disagree with the Corps' acceptance of the Port's claim that Shoal Point was not economically feasible due to limitations on the use of bond funds for sites outside of Harris County. The EPA in *Bersani* agreed that "[a]n alternative is practicable if it 'is available' and 'capable of being done after taking into consideration cost, existing technology and logistics in light of overall plan purposes.'" *See Bersani*, 674 F.Supp. at 418.

Plaintiffs' argument focuses exclusively on the "practicable" element (and specifically the availability prong) of the "practicable alternatives tests" and neglect the other components of the test. Secondarily, the record also indicates that Shoal Point is not environmentally preferable under Section 404, despite the Corps considering it an environmentally preferred alternative." (AR 3297 at 27).

The Port's position is that the Corps complied with the Clean Water Act. The Port asserts that the CWA authorized the Corps to issue permits for the discharge of dredged or fill material into waters of the United States. The CWA involves water and the aquatic ecosystem only. (Instrument No. 94, at 30). Specifically, the Port contends that the Corps complied with the CWA guidelines regarding the least environmentally damaging practicable alternative analysis. The Port contends that the Corps properly determined that Shoal Point is not the least environmentally damaging practicable alternative, because it is and was not available to the Corps. The Port argues that a "practicable alternative" is one "that is available and capable of being done after taking into consideration cost, exiting technology, and logistics in light of overall project purposes." (Instrument No. 94, at 31–32). Additionally, "if it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered." (Id., at 32). According to the Port, the record shows that the Port cannot condemn property outside of Harris County and cannot spend the proceeds of the revenue bonds from the 1999 election to build the project in counties other than Harris County. (AR 3297 at 29, 111–12; AR 307). Shoal Point is in Galveston County, therefore the Port asserts that it is and was not a reasonable obtainable site, due to the restrictions on their use of funds. (Instrument No. 94, at 31–32).

Further the Port asserts that the Administrative Record shows that the Shoal Point has an equal or greater impact on the aquatic ecosystem as Bayport. The effect on the amount of wetlands is almost exactly the same and the Corps expressly found that the Shoal Point alternative would have "significant adverse impacts to bay bottom surface sediments. The Bay-

port [Project] ... would [ ] have less than significant adverse impacts to surface sediments." (AR 3297 at 26).

The Court finds that Shoal Point is not a "practicable" alternative, as defined in the 404(b)(1) Guidelines, which account for "cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The Port cannot use its power of eminent domain to condemn Shoal Point, because it is property outside of Harris County, and the Port cannot spend the proceeds of the revenue from the 1999 bond election to build the project in counties other than Harris County. *See* TEX. WATER CODE §§ 62.1071, 62.209; (AR 3297 at 29, 111–112). Plaintiffs argue that because the Port purchased Pelican Island, which sits outside Harris County, they could have purchased Shoal Point. The Plaintiffs would like the Court to get involved in mandating how the Port should allocate its finances. This is not an appropriate role for the Court or for the Corps.

Plaintiffs next argue that Shoal Point is a practicable alternative because the guidelines allow the consideration of an alternative that the applicant does not own if it reasonably can be obtained by the applicant. 40 C.F.R. § 230.10(a)(2).[6] Plaintiffs ignore the requirement that the non-owned site be "reasonably" obtainable. Shoal Point is not and never has been "reasonably" obtainable by the Port for the same reasons discussed above—the Port cannot condemn property in Galveston County. (AR 3297 at 29). Thus, Plaintiffs' argument that Shoal Point was "available" to the Port in 1998 is without merit because the Port could not "reasonably" have obtained that site then or at

any time because of its location in Galveston County. Plaintiffs' argument that Shoal Point was "available" to the Port until August 1, 2000 because the City of Texas City issued a Request for Proposals that was open until that date is equally flawed for several reasons. In the first instance, the Request for Proposal sought investors to build Texas City's own project, the Shoal Point terminal, which has fewer container berths (6) than the Bayport Project (7), no cruise berths, and is 45' deep, which is not what the Port wanted to build. Additionally, the Texas City did not apply for its permit to build Shoal Point until April 2000. Thus, there was only a narrow window during which the City of Texas City was seeking a partner and in which the Port could have responded to the Request for Proposal, but the Port was not able to, because it had no funds to expend on a terminal in Galveston County. (AR 3297 at 29).

Shoreacres also claims that the Corps' determination is arbitrary and capricious because the District Engineer did not consider the same factors that other Corps districts might consider in making their own jurisdictional determinations. The Corps asserts that Shoreacres' reliance is misplaced. The General Accounting Office's Report ("GAO") found that certain Corps districts differ somewhat in their consideration of factors. The GAO identified several reasons for these differences. The GAO Report demonstrates that there are valid reasons why some Corps districts take different approaches in making jurisdictional determinations. (Instrument No. 99, at 8).

---

6. Plaintiffs, however, ignore the fundamental caveat to this rule, which is that such a non-owned alternative may be considered if it is otherwise a practicable alternative. 40 C.F.R. § 230.10(a)(2). As shown above, Shoal Point is not otherwise a practicable alternative because it does not have a less adverse impact on the aquatic ecosystem, may result in other environmentally adverse consequences, and is prohibitively expensive.

The Corps asserts that Shoreacres suggests that the Corps should have considered whether the Port could use operational revenues, rather than bond funds, to purchase the site. The Corps maintains, however, that it is not required to second-guess the financial decisions of the Port, a government entity established by Texas law, or the decision by the Harris County voters to approve the $387 million bond referendum. (Id., at 11–12).

The Court finds that the Corps' conclusion that Shoal Point was an area that was not presently owned by the applicant and that was not *reasonably* obtainable due to the Port's financing and condemnation limitations was not arbitrary and capricious.

Although the Corps considered Shoal Point "the environmentally preferred alternative followed by Bayport and Spilmans Island Alternatives" (AR 3297 at 27), to be a "practicable alternative", Shoal Point must have "less adverse impact on the aquatic ecosystem" than the Bayport Project. 40 C.F.R. 230.10(a); (AR 2385.12, Tables 3.19–1; 2.4; AR 3297 at 8, 14, and Table 2—comparing wetlands impacts). Because the Corps found Shoal Point to be unavailable, it was not required to consider it a "practicable alternative." 40 C.F.R. § 230.10(a)(2) ("Practicable" means that an alternative is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.") (AR 3297 at 29).

However, the Corps did collect information that would make such a determination possible, if necessary. The Corps found that locating the Bayport Project at the Bayport site would involve the potential filling or deepening of 129 acres of non-wetland aquatic resources (bay bottom), whereas locating the Project at Shoal Point would involve the potential filling or deepening of 171 acres of non-wetland aquatic resources (bay bottom). (AR 2385.12, Table 2–4; AR 3297 at 26).

The Corps also expressly found that the Shoal Point alternative would have "significant adverse impacts to bay bottom surface sediments." (AR 3297 at 26). Thus, Shoal Point was not a "least damaging practicable alternative" because it would not impact the aquatic ecosystem less than the Bayport site would. Moreover, the Corps found that the Shoal Point alternative would have "significant adverse impacts due to displacement of large areas of dredge spoils disposal alternatives." (AR 3297, at 27). The Corps noted that Bayport would have less of these types of aquatic impacts. (AR 3297 at 26–27).

Therefore, the Court finds that Plaintiffs cannot establish that Shoal Point is the environmentally preferable alternative under the 404(b)(1) Guidelines or that the Corps was arbitrary and capricious in finding that Shoal Point was not an available practicable alternative.

### 2. *Pelican Island*

Plaintiffs allege that the Corps was arbitrary and capricious in finding Pelican Island not to be the least damaging practicable alternative to the Bayport site. As discussed above, to be a practicable alternative, the alternative must have less adverse impact on the aquatic ecosystem and have no other significant adverse environmental consequences. 40 C.F.R. § 230.10(a). As with Shoal Point, the Corps eliminated the Pelican Island from further consideration because it was found to have greater impact on the existing environment than the remaining alternatives. (AR 3297 at 16–27 and Table 3; AR 2385.12 (FEIS) at Table 2–4). Specifically, because Pelican Island is an active disposal site for dredge materials, the disposal site would have to be relocated, creating further environmental impacts. (AR 2385.11

§ 3.18.2.6 at 3.19–14–15; AR 3297 at 26–27). In addition, the Pelican Island alternative would result in the most erosion, oyster reefs could be impacted and additional maintenance and dredging would be required. (AR 3297 at 16, 20–27 and Table 3; AR 2385.12 at Table 2–4; AR 2385.11 at 3.15–10–12). Therefore, the Corps correctly eliminated Pelican Island as a practicable alternative. This decision was not arbitrary or capricious.

In summary, the Court finds that the actions of the Corps fully considered and complied with the requirements of the National Environmental Policy Act and the Clean Water Act. During Plaintiffs' oral argument they excitedly described the actions of the Corps as a "smoking gun", but after a thorough review of the Administrative Record, the Plaintiffs' complaints can more accurately be described as a blunderbuss salvo of quibbles. Accordingly, based on the foregoing, the Court finds in favor of Defendants. Defendants' motions for summary judgment (**Instrument Nos. 94 and 96**) are **GRANTED** and Plaintiffs' motion (**Instrument No. 92**) is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.