# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00363-CV

**City of Shoreacres, City of Taylor Lake Village, City of Seabrook and The Galveston Bay Conservation and Preservation Association, Appellants**

**v.**

**Texas Commission on Environmental Quality and Port of Houston Authority, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. GV304754, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

The Port of Houston Authority has begun construction of the Bayport Project, a containerized cargo and cruise ship terminal complex in an industrial-zoned area on the existing Bayport Ship Channel in Galveston Bay. We must decide whether the Port of Houston had to obtain state authorization for the project from the Texas Commission on Environmental Quality, independent of the federal "dredge-and-fill" permit that the Port obtained from the United States Army Corps of Engineers. If it did not, we must decide whether the issuance of a federal "dredge-and-fill" permit and the commencement of construction on the Bayport Project mooted this

controversy. The City of Shoreacres, City of Taylor Lake Village, City of Seabrook and the Galveston Bay Conservation and Preservation Association appeal a district court judgment dismissing their suit against the Commission for lack of jurisdiction based on mootness. For the reasons discussed below, we affirm the district court's judgment.

## BACKGROUND

The Port of Houston Authority has begun construction of the Bayport Project, a containerized cargo and cruise ship terminal complex in an industrial-zoned area on the existing Bayport Ship Channel in Galveston Bay. In 2003, it was estimated that dredging and filling activities for the construction of the container and cruise terminals would be completed in four phases, over 15-20 years. The project is located south of the City of Shoreacres, east of the City of Taylor Lake Village, north of the City of Seabrook, and along the channel that services several chemical manufacturing facilities. The Galveston Bay Conservation and Preservation Association is a public interest group that monitors Galveston Bay and whose members use the bay for recreation.[1]

Before beginning construction on the Bayport Project, the Port had to obtain a Clean Water Act dredge-and-fill permit (also known as a "section 404 permit") from the United States Army Corps of Engineers, authorizing the Port to discharge dredged and fill material into the navigable waters of the United States.[2] *See* 33 U.S.C.A. § 1344 (West 2001). In conjunction with

---

[1] We will refer to the cities of Shoreacres, Taylor Lake Village, and Seabrook and the Galveston Bay Conservation and Preservation Association collectively as "Cities."

[2] We grant the Port's unopposed motion requesting that this Court take judicial notice of a certified copy of permit number 21520 issued by the Galveston District of the United States Army Corps of Engineers to the Port of Houston Authority, authorizing construction of the Bayport Project.

the federal permit process, the Texas Commission on Environmental Quality issued a "section 401 certification" which found that the project would meet state water quality standards and be consistent with the state coastal management program. *See* 33 U.S.C.A. § 1341(a)(1) (West 2001); 16 U.S.C.A. § 1456 (West 2001); Tex. Nat. Res. Code Ann. §§ 33.205(b) (West Supp. 2004-05), 33.2053(f)(6) (West 2001); 30 Tex. Admin. Code § 281.45(a)(2)(G) (2003); 31 Tex. Admin. Code § 505.11(a)(6)(F) (2003). The Clean Water Act empowers the Commission to grant, deny, or waive the section 401 certification. *See* 33 U.S.C.A. § 1341(a)(1); *see also* 30 Tex. Admin. Code § 279.2(b)(1)-(4) (2003).

The Port filed its application for a dredge-and-fill permit in 1998. In November 1999, Harris County voters approved $387 million in bonds for the Bayport Project's construction. From 1999 through 2003, the Commission and the Corps evaluated the project. At least five public information workshops and a public hearing were held between 1999 and 2001. Published notices advised the public of the thirty-day comment periods following the draft version and final version of the Corps's environmental impact statement. Written comments on the project were accepted until September 12, 2003.

Based on public input and its own study, the Commission added several special conditions to the project to ensure its conformity with Texas environmental policies. The United States Environmental Protection Agency, the United States Fish and Wildlife Service, the Texas Parks and Wildlife Service, and the Commission found that the Port's final mitigation plan adequately compensated for the project's environmental impacts. The Commission issued its section 401 certification without conditions on December 16, 2003, after determining that the project met

3

state water quality standards and was consistent with the state coastal management program's goals and policies.

On December 17, 2003, the Cities filed an administrative appeal in a Travis County district court seeking reversal of the certification and remand to the Commission. The Port intervened in the suit the following day. The Cities sought a declaration that the water quality certifications and coastal consistency determinations issued by the Commission's executive director were not final actions and could not be relied upon by a federal agency or a private applicant as final state decisions until the Commission and the Coastal Coordination Council had completed their review. They also requested a declaration that the Commission's rules authorizing its executive director to issue final water quality certifications without appeal to the Commission were contrary to its authorizing statutes.

Additionally, the Cities sought a temporary restraining order and temporary injunction to suspend the Commission's water quality certification and coastal consistency determination, enjoin the Commission from representing that its order granting the certification and consistency determination was final, and maintain the status quo by advising the Port and the Corps of the temporary restraining order. Although the Cities had a hearing set in December 2003 on their request for injunctive relief (which, if granted, could have postponed the effectiveness of the Commission's section 401 certification) the Cities agreed to pass that hearing and did not reset it.

The Corps issued its record of decision on December 19, 2003, recommending the issuance of a dredge-and-fill permit for the Bayport Project. On December 23, 2003, the Cities requested that the Coastal Coordination Council review the Commission's 401 certification and

4

coastal consistency determination for the Port's dredge-and-fill permit. The Council did not grant review.[3]

The Corps issued a federal permit to the Port on January 5, 2004, authorizing construction to commence on the Bayport Project.[4] On January 28, 2004, the Commission "declined to take action" on the Cities' motion to overturn the section 401 certification that preceded the permit's issuance.[5] After losing their motion to overturn, the Cities filed a second administrative appeal with the district court.[6] The district court consolidated the suits.

The Port filed a motion to dismiss on April 29, 2004, arguing that matters regarding the Commission's certification were moot because the Corps had issued a federal permit in reliance on the state certification and any revocation of the certification would not affect the validity of the

---

[3] The record does not reflect the Council's decision on the requested review but the parties agree that the Council did not take the appeal. The Port and the Commission assert that the Cities were unable to secure the votes of three council members necessary for the Council's review. *See* Tex. Nat. Res. Code Ann. § 33.205(c)(3) (West Supp. 2004-05). The Cities claim that they "do not know why" the Council did not take their appeal.

[4] The City of Shoreacres, City of Taylor Lake Village, and the Galveston Bay Conservation and Preservation Association sued the Corps in federal court challenging its issuance of the Bayport Project permit. *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 996 (S.D. Tex. 2004). The Port intervened. *Id*. The court granted summary judgment in favor of the Corps and the Port. *Id*. at 1023.

[5] The Commission's ruling was based on its intent to deny the motion to overturn for lack of jurisdiction, which it deemed equivalent to "declining to take any action" on the motion.

[6] The original petition in the second suit states that it is filed "as a protective measure" to ensure the filing of a petition within thirty days of the Commission's declined action on the motion to overturn the section 401 certification. *See* Tex. Water Code Ann. § 5.351(b) (West 2000).

permit that authorized the Bayport Project's progress. The district court issued a final judgment on May 28, 2004, granting the Port's motion and dismissing the Cities' claims for lack of subject-matter jurisdiction based on mootness. The Port began construction of the Bayport Project in June 2004. The Port's work on the container terminal already encompasses the complete footprint for the first of the four phases of construction. Construction has now moved beyond phase one to include work on the initial cruise terminal facilities.

In two points of error, the Cities challenge the district court's dismissal of their administrative appeal of the Commission's decisions and their requests for declaratory judgment. They contend that the issuance of the federal permit and the commencement of construction on the Bayport Project did not moot this controversy because the Port cannot continue the project without "state authorization that is separate and independent of the Federal process." They also contend that their requested declaratory relief is within the "capable of repetition yet evading review" exception to mootness. The Cities ask this Court to reverse and remand the judgment of the district court so that they may attempt to reverse the Commission's decisions, "leaving the [Port] without valid authorizations and requiring new decisions by [the Commission] for authorizations before the [Port] can proceed legally under Texas law." (Emphasis in original.)

## ANALYSIS

**Standard of Review**

Whether a district court has subject-matter jurisdiction is a legal question that is reviewed *de novo. Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex.

2002). Because the issue of mootness implicates a court's subject-matter jurisdiction, we review the trial court's dismissal in this case *de novo*. *See Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 229 (Tex. 1993); *Pantera Energy Co. v. Railroad Comm'n*, 150 S.W.3d 466, 471 (Tex. App.—Austin 2004, no pet.).

A case becomes moot when a party seeks to obtain a judgment on some controversy when none actually exists; or when a party seeks a judgment on a matter which, when rendered for any reason, cannot have any practical legal effect on a then existing controversy. *Pantera Energy Co.*, 150 S.W.3d at 471. A dismissal for mootness is not a ruling on the merits; rather, it is the court's recognition that it lacks jurisdiction under the Texas Constitution to render advisory opinions. *Speer*, 847 S.W.2d at 229 (citing Tex. Const. art. II, § 1). Thus, if a court's ruling on the merits in this case—which questions the validity of the Commission's certification for the federal permit—would not have a practical effect on a live controversy, it would constitute a prohibited advisory opinion. *See id.* at 472.

**Cities' Petitions**

The Cities contend that the Port cannot continue the Bayport Project without "state authorization that is separate and independent of the Federal process." Neither of the Cities' petitions, however, contain this "independent state authorization" claim. Throughout the petitions, the Cities address reversal of the state's certification within the federal permitting process and with the objective of halting the Bayport Project. If the federal permit's issuance was irrelevant to "state

7

authorization" for the Bayport Project, and preventing the project's progress was not the Cities' goal, it is not discernable from their petitions.

For instance, both petitions state: "In conjunction with the permit process, [the Commission] is given the role of determining whether the project meets state water quality standards and is consistent with the state coastal management program." Thus, the petitions do not allege that the Commission makes its determinations "separate and independent" of the federal permit process, but as a part of it. The petitions also define the state coastal consistency determination as the "state process for review of federal actions and permits." There is no mention of a coastal consistency determination conducted by the Commission "separate and independent" of the federal actions and permits. That section also notes "[i]n an effort to avoid duplication and delays in the consistency review process, the Texas program provides that Texas agencies must review their decisions related to federal actions or permits to determine if the state action is consistent with the coastal program. . . . [A] determination that the Project would not be consistent with the coastal program would block the permit and, thus, the Project." This section reiterates the Cities' objectives of avoiding the issuance of a federal section 404 permit and stopping the Bayport Project.

The Cities' petitions sought declarations that the water quality certifications and coastal consistency determinations could not be relied upon by a federal agency or a private applicant as final state decisions until the Commission and the Coastal Coordination Council had completed their review. These requested declarations sought to prevent the Corps or the Port from relying on the Commission's certification for the issuance of a federal permit.

8

Additionally, the Cities petitioned the court for a temporary restraining order and temporary injunction to "suspend the Commission's water quality certification and coastal consistency determination," "enjoin the Commission from representing that its order granting the certification and consistency determination was final," and "maintain the status quo by advising the Port and the Corps of the temporary restraining order." The petitions identify the effects on the Cities "if the proposed Bayport Project is built" and "if the Bayport Project proceeds." All of the injunctive relief the Cities sought was designed to prevent the issuance of the federal dredge-and-fill permit and stop construction of the Bayport Project before it began.

Furthermore, if the Cities thought that a "state authorization separate and independent of the Federal process" was necessary for the Bayport Project, their petitions would not have characterized the issuance of a federal 404 permit as a "risk":

> There is a significant risk that the United States Army Corps of Engineers will accept the [Executive Director's] determinations as final actions of the State and allow the Corps to grant a permit to the Port of Houston to begin construction and to dredge and fill areas of Galveston Bay, associated wetlands and streams. The Port has advised [the Cities] and others that it intends to begin construction of the Bayport Project as soon as it obtains a permit from the Corps of Engineers.

The focus on the federal permit evident in the Cities' petitions is entirely consistent with the mootness concern the Cities addressed in their letter of September 12, 2003, to the Commission, the General Land Office, and the Corps:

> The [Coastal Coordination Council] consistency review provided in Texas law and [Coastal Coordination Council] rules must occur within a twenty-six day period after the 401 certification is issued. Thus, the review could occur *after the Corps has*

9

*issued its 404 permit*, and a permittee has implemented its project.  A consistency review at that time *would likely be moot.*

(Emphasis added.)  This is the review that the Cities now ask us to authorize.

Read fairly, the Cities' petitions complained that the Commission's flawed water quality certification and coastal consistency determination processes could support the issuance of a federal dredge-and-fill permit that would authorize construction of the Bayport Project.  They wanted the Commission's certification reviewed before the Corps issued a federal permit.  The allegations are not pled in the alternative.  The petitions were never amended or supplemented; rather, an "independent state authorization" claim was introduced in the Cities' response to the Port's motion to dismiss, filed two days before the district court's hearing on the motion.

Nothing in the Cities' petitions resembles the contentions in their appellate briefing, which assert that there are "parallel permitting programs in place, [requiring that] both [federal and state] authorizations must be obtained" and that "[i]ssuance of the federal permit does not negate the need for issuance of the separate state permit that was created in state law."  The Cities' brief also argues that "[w]hether the Corps of Engineers has issued a federal permit is of no importance" and that this appeal "does not address whether [the Commission] could revoke [its] decisions [to issue the water quality certification and coastal consistency determination] or what impact such a revocation might have."

Even if the Cities had included their "independent state authorization" claim in their petitions, they could not prevail on such a claim.  Under the current statutory scheme, no separate state authorization is required in Texas for the issuance of a section 404 dredge-and-fill permit.

10

**Section 401 Certification Process**

The Cities assert that "[i]ssuance of the federal permit does not negate the need for issuance of the separate *state permit* that was created in state law." (Emphasis added.) But Texas law expressly forbids the Commission to issue a dredge-and-fill permit:

> The commission may not require under this chapter any permit for the placing of dredged or fill materials into or adjacent to water in the state for the purpose of constructing, modifying, or maintaining facilities or structures, but this does not change or limit any authority the commission may have with respect to the control of water quality. The commission may adopt rules and regulations to govern and control the discharge of dredged or fill materials consistent with the purpose of this chapter.

Tex. Water Code Ann. § 26.027(d) (West 2000).

While the Commission did not issue its own dredge-and-fill permit, it participated in the federal 404 permitting process by issuing a section 401 certification. *See* 33 U.S.C.A. § 1341(a)(1). This 401 certification is the state's finding that "there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3). The Commission's 401 certification is a unified process that includes a project's consistency with the state coastal management program as part of its water quality certification.[7] *See* 16 U.S.C.A. § 1456(c)(3)(A); Tex. Nat. Res. Code Ann. §§ 33.205(b), 33.2053(f)(6); 30 Tex. Admin. Code § 281.45(a)(2)(G); 31 Tex. Admin. Code § 505.11(a)(6)(F).

---

[7] In this case, the Coastal Coordination Council also notified the Port that the Commission would be "solely responsible for determining the project's consistency with the goals and policies of the [coastal management program]" and that "[t]his determination [would] accompany the [Commission's] section 401 certification."

This process furthers the Texas coastal management program's intent to avoid creation of additional layers of bureaucracy. *See* 31 Tex. Admin. Code § 505.10(a)(3) (West 2003). The legislative history of rule 505.10 clarifies that the coastal consistency review is intended to "identify, address, and resolve consistency issues within the agencies' existing permitting processes." *See* 19 Tex. Reg. 7670 (1994) (31 Tex. Admin. Code § 505.10) (proposed March 18, 1994).

The Clean Water Act empowers the Commission to grant, deny, or waive the section 401 certification. *See* 33 U.S.C.A. § 1341(a)(1); 30 Tex. Admin. Code § 279.2(b)(1)-(4). The state has one year to act on the request for 401 certification. 33 U.S.C.A. § 1341(a)(1); *see also* Processing of Department of the Army Permits, 33 C.F.R. § 325.2(b)(1)(ii) (2004) (Corps regulation generally requiring certification or waiver within 60 days for Corps permit); 30 Tex. Admin. Code § 279.11 (Commission rule generally requiring certification or waiver within 60 days for Corps permit). The state has veto power over the federal permit, because it will not issue if the state denies 401 certification. 33 U.S.C.A. § 1341(a)(1). But if the state fails to act on the request for certification within one year, the federal agency may consider the state certification waived and issue the 404 permit. *Id*.

An analogous deadline applies to state coastal consistency determinations. An applicant seeking to conduct activity affecting any natural resource of the coastal zone must certify to the federal permitting agency and to the state that the proposed activity complies with the enforceable policies of the state's approved coastal management program. 16 U.S.C.A. § 1456(c)(3)(A). The state has six months from the date of receipt of the applicant's certification to notify the federal agency that the state concurs with or objects to the applicant's certification. *Id*.

If the state does not notify the federal permitting agency within six months, the state's concurrence with the certification is conclusively presumed. *Id*.; 33 C.F.R. § 325.2(b)(2)(ii) (2004).

After certification, the Act allows states to continuously monitor projects and notify a federal permitting agency of any water quality change that threatens the project's continued compliance with the Clean Water Act. 33 U.S.C.A. § 1341(a)(3) (West 2001).

**Functions of Certifications Versus Permits**

A state's water quality certification does not authorize any activity. *See*, *e.g.*, *National Marine Serv. Inc. v. Environmental Prot. Agency*, 458 N.E.2d 551, 558 (Ill. Ct. App. 1983) (even if plaintiff had been certified, no construction could have begun until permit was issued by Corps). It is the federal section 404 permit that authorizes the discharge of dredged and fill material into the navigable waters of the United States. *See* 33 U.S.C.A. § 1344 (West 2001). The state certification merely confirms compliance with applicable water quality standards and lists any conditions on how the activity will be accomplished. 33 U.S.C.A. § 1341(d) (West 2001); 40 C.F.R. §§ 121.2(a) (2004), .1(e) (2004) (certifying agency certifies compliance with applicable water quality standards), .2(a)(4) (2004); 30 Tex. Admin. Code § 279.11(d)(2)(A)(i)-(ii) (2003). Before the federal permit is issued, the state may set any limitations and monitoring requirements necessary for compliance with state and federal water quality standards. *See* 33 U.S.C.A. § 1341(d); 40 C.F.R. § 121.2(a)(4); 30 Tex. Admin. Code § 279.11(d)(2)(A)(ii). Such limitations and requirements become conditions on the permit.[8] *See* 33 U.S.C.A. § 1341(d). But once a project has been granted

_____

[8] As noted earlier, the Commission issued its section 401 *certification* without conditions, but it had previously added several special conditions to the *project* to ensure its conformity with

13

a federal permit, it proceeds under the authority of that permit, not the state-issued water quality certification:

> It seems clear to us that permits and certificates are two different breeds of animal. Black's Law Dictionary defines a certificate as a written assurance, or official representation, that some act has or has not been done, or some event occurred, or some legal formality has been complied with. . . . Black's defines a permit as, in general, any document which grants a person the right to do something, a license or grant of authority to do anything. . . . We note in this case that even if plaintiff had been certified, no construction [on the barge fleeting facility] could have begun until a [dredge-and-fill] permit was issued by the United States Army Corps of Engineers.

*National Marine Serv. Inc.*, 458 N.E.2d at 558; *accord Triska v. Department of Health & Envtl. Control*, 355 S.E.2d 531, 534 (S.C. 1987) ("permit" is not same as "certification").

The Commission's power to issue the section 401 certification is solely a creature of federal law. *See Arnold Irrigation Dist. v. Department of Envtl. Quality*, 717 P.2d 1274, 1278 (Or. Ct. App. 1986), review denied, 726 P.2d 377 (Or. 1986). As such, states are not authorized under the Clean Water Act to unilaterally revoke, modify, or amend a state water quality certification after the certification process for a federal permit is complete. *See*, *e.g.*, *Puerto Rico Sun Oil Co. v. United States Envtl. Prot. Agency*, 8 F.3d 73, 80 (1st Cir. 1993) (state agency's characterization of its 401 certification as nonfinal did not affect procedural validity of federal permit); *Keating v. Federal Energy Regulatory Comm'n*, 927 F.2d 616, 624 (D.C. Cir. 1991) (disputes over validity of section 401 certification are state matters so long as they precede issuance of federal permit); *Triska*, 355 S.E.2d at 534 (state lacks power to suspend or revoke section 401 certification after it is granted

---

Texas environmental policies.

by agency and appeals process expires); *see also* Angus E. Crane, *Who's in Charge Here? An Analysis of the Enforcement of State Water Quality Certification Standards*, 1 Wis. Envtl. L.J. 89, 102 (1994).

The Clean Water Act allows a state to revoke a prior certification

> only if certain conditions are met. The first is timeliness: the state must notify the relevant federal licensing agency of its intention to revoke within 60 days of the time it is itself notified that a new license application is pending. The second is that the revocation be driven by some change in circumstances "since the construction license or permit certification was issued." . . . If either of these conditions is not met—if the state's decision comes too late or if it is not pursuant to changed circumstances—then the attempted revocation is invalid as a matter of federal law and no further inquiry is needed.

*Keating*, 927 F.2d at 624 (citing 33 U.S.C.A. § 1341(a)(3)). The Clean Water Act allows a state to revoke a prior certification only within this specified time limit and only pursuant to these defined circumstances. *Id.*; *see also Caribbean Petroleum Corp. v. United States Envtl. Prot. Agency*, 28 F.3d 232, 235 (1st Cir. 1994) (Puerto Rico's water quality certification was incorporated into federal permit, although certification was still undergoing agency review, because commonwealth failed to stay certification before federal permit issued). If a state could revoke a prior certification at any time and for any reason, section 1341(a)(3) would be rendered meaningless. *Keating*, 927 F.2d at 624. In this case, the time for revocation of the Commission's prior certification has expired. *See* 33 U.S.C.A. § 1341(a)(3).

Moreover, any attempt to modify the state certification is futile unless the authorization granted in the federal permit will be similarly modified:

> Giving [the state agency] authority to revoke Certification after the Certification and appeals process is over serves no useful function and only breeds confusion; particularly in a case such as this where the Certification was revoked and after some five years had passed and where permits had already been issued by the Corps of Engineers and the Coastal Council. Even if [the state agency] had authority to revoke Certification in the instant case, it would be a futile act unless the permitting agencies subsequently suspended and revoked their respective permits.

*Triska*, 355 S.E.2d at 534. In *Triska*, the court also noted that if the state had concerns about changes in water quality, it should notify the permitting agencies so that they might review the permits. *Id*.

States that actually require a separate state authorization for dredging and filling activity typically call their authorization a "permit" and have unambiguous statutes and regulations requiring applicants to obtain a state dredge-and-fill permit in addition to the federal permit. *See*, *e.g.*, Cal. Pub. Res. Code § 30600 (West Supp. 2005) (state coastal development permit required); Conn. Gen. Stat. § 22a-361 (West Supp. 2005) (state permit required for dredging or placement of fill); La. Rev. Stat. Ann. § 49:214.30 (West Supp. 2005) (state coastal use permit required); N.Y. Envtl. Conservation Law § 24-0701 (West 1997) (state permit required for filling freshwater wetlands); Ohio Rev. Code Ann. § 1506.07 (West 1996) (state permit required for coastal erosion area); Va. Code Ann. § 62.1-44.15:5(D) (Michie 2004) (state permit required for draining or filling wetland); *Sheridan v. Deep Lagoon Marina*, 576 So. 2d 771, 772 (Fla. Dist. Ct. App. 1991) (marina applied for Chapter 403 Florida Statutes, dredge-and-fill permit and for certification of compliance with federal Clean Water Act); *In re Appeal of Broad & Gales Creek Cmty. Ass'n*, 266 S.E.2d 645, 645 (N.C. 1980) (association sought North Carolina dredge-and-fill permit from Department of Natural Resources and Community Development to construct boat launching ramp). Two states have had the federal dredge-and-fill permitting process delegated to them under 33 U.S.C.A.

16

§ 1344(g), (h) (West 2001). *See* Environmental Protection Agency Approved State Programs, 40 C.F.R. §§ 233.70 (2004) (delegation to Michigan Department of Natural Resources), 233.71 (2004) (delegation to New Jersey Department of Environmental Protection and Energy).

Unlike these states, Texas does not have a dredge-and-fill permitting program independent of the federal process. An assertion that Texas has such a program is irreconcilable with the water code, which prohibits the Commission from issuing dredge-and-fill permits. Tex. Water Code Ann. § 26.027(d). The consistency review process is not a separate authorization either, as it is intended to "identify, address, and resolve consistency issues within the agencies' *existing permitting processes*." *See* 19 Tex. Reg. 7670 (emphasis added). Texas law consistently references the Commission's "certification" within the context of the federal Clean Water Act permitting process. *See*, *e.g.*, Tex. Nat. Res. Code Ann. § 33.2053(f)(6); 30 Tex. Admin. Code §§ 279.1 (2003), 279.2 (a)-(b) (2003); 30 Tex. Admin. Code § 281.45(a)(2)(G).

The Cities rely on the following rule for the proposition that separate state approvals are required under the state coastal program:

> Pending council review of an individual agency proposed action, no person may conduct activities authorized by the agency action that would irreparably alter or damage the [Coastal Natural Resource Area] identified in the applicable policy, except as otherwise provided by the Texas Administrative Procedure Act § 2001.054.

31 Tex. Admin. Code § 505.37 (2003). This section appears in a subchapter that discusses the Coastal Coordination Council's review of proposed state agency actions. *Id*. Here, however, there is no "review pending" with the Coastal Coordination Council. The Council did not take the Cities' appeal. There is no "proposed action" on the part of the Commission. The Commission completed

17

its role when it issued a section 401 certification on December 16, 2003. Furthermore, there was no activity "authorized" by the Commission in this case. The section 401 certification does not authorize the Port to conduct any activity. Only the federal 404 permit authorizes the Bayport Project.

The fallacy of the Cities' argument is particularly apparent when applied to a scenario in which the Commission waives its section 401 certification and the Corps issues a section 404 permit for a project in reliance on the state's waiver. *See* 33 U.S.C.A. § 1341(a)(1); 30 Tex. Admin. Code § 279.2(4); *see generally Environmental Def. Fund, Inc. v. Alexander*, 501 F. Supp. 742, 771 (N.D. Miss. 1980) (Corps issued permit after state agency affirmatively waived 401 certification). In that instance, under the Cities' argument, the Port would be unable to proceed because the project lacks a separate "state authorization" from the Commission. But nothing in federal or Texas law would prevent the Port from proceeding legally with its project. *See* 33 U.S.C.A. § 1341(a)(1); 30 Tex. Admin. Code § 279.2(4).

**Effect of State Court Ruling on Validity of This Section 401 Certification**

The Cities' post-submission letter brief states that they were unable to find any case where the appeal of a decision granting or denying a certificate of compliance with state water quality standards was ruled to be moot once a related federal action had been taken. Although it is an unpublished decision, a case with parallel facts is cited in the Port's brief. *See Minnesota Ctr. for Envtl. Advocacy v. Minnesota Pollution Control Agency*, 1998 Minn. App. LEXIS 953, at *2 (Minn. App.—August 18, 1998) (not designated for publication).

18

In that case, the Minnesota Center for Environmental Advocacy sought state court review of the Minnesota Pollution Control Agency's grant of section 401 certification to a project that received a federal dredge-and-fill permit. *See id.* State certification was a legal prerequisite for a federal permit to build a floodwater storage dam because its construction involved discharging fill into 1.7 acres of Minnesota's wetlands. *Id.*

The Wild Rice Watershed District applied for a section 404 dredge-and-fill permit with the Corps in July 1992. *Id.* The Corps issued a public notice regarding the permit application in January 1995, describing the project and inviting public comment. *Id.* Thirteen months later, the Corps advised the Agency that the Corps considered the section 401 certification waived because the Agency had failed to take any certification action within one year of the public notice. *Id.* at *3; *see also* 33 U.S.C.A. § 1341(a)(1). The Corps issued a section 404 permit to the District in July 1997. *Id.* The Agency granted a section 401 certification in August 1997. *Id.*

The Center challenged the Agency's section 401 certification, arguing that it was invalid because the Agency failed to follow its procedural rules and because the certification was arbitrary and capricious. *Id.* at *5. The District argued that the Center's challenge to the certification was meaningless. *Id.* The court observed that the Corps granted the permit based on its determination that the state certification requirement had been waived. *Id.* The court found that

> the [Agency's] belated grant of certification had no impact on the previously issued section 404 permit, nor did it affect the District's ability to go forward with the project. Any determination by this court as to the validity of the certification would, as a consequence, have no legal effect. . . . This court cannot grant effectual relief at this time. Relator's appeal of the [Agency's] 401 certification is, therefore, moot.

19

*Id.* at *5-6.

While the Minnesota court's opinion is not binding upon this Court, its reasoning is sound. Like the appellants in the Minnesota case, the Cities sought state court review of a state agency's 401 certification because of the agency's alleged failure to follow its procedural rules. The project's progress in this case is similarly authorized by a federal permit, not a state 401 certification. The time for the Commission to condition its certification or place additional "special conditions" on the Bayport Project has passed. *See* 16 U.S.C.A. § 1456(c)(3)(A); 33 U.S.C.A. § 1341(a)(1); 33 C.F.R. § 325.2(b)(1)(ii), (b)(2)(ii); 30 Tex. Admin. Code § 279.11.

The federal permit alone authorizes continued progress of the Bayport Project. The Cities cannot now alter the federal permit. The orders that the Cities sought from the district court (reversing the Commission's determination that the federal permit to be issued to the Port would comply with the Commission's water quality standards and be consistent with the Texas coastal zone management program) became moot upon issuance of the federal 404 permit because the Cities' requested relief would not have had a practical legal effect on the controversy between the parties. From that point forward, the district court lacked jurisdiction to make any ruling concerning the validity of the Commission's section 401 certification. *See General Land Office v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex. 1990) (judicial power does not embrace giving advisory opinions); *Texas Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153 (Tex. App.—Austin 1998, no pet.) (declaratory judgment is only appropriate if justiciable controversy exists and will be resolved by declaration sought; justiciable controversy must be distinguished from advisory opinion, which is prohibited under both Texas and federal constitutions).

The Cities' request for declaratory relief does not change the status of their lawsuit. *See IT-Davy*, 74 S.W.3d at 855; *Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 266-67 (Tex. App.—Austin 2002, no pet.). The trial court's final judgment granted the Port's motion and dismissed "all of [Cities'] claims for want of subject-matter jurisdiction" based on mootness. This final judgment, contrary to the Cities' argument, included the Cities' request for declaratory judgment. The Declaratory Judgment Act does not extend a trial court's jurisdiction, and a litigant's request for declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature. *IT-Davy*, 74 S.W.3d at 855; *Beacon Nat'l Ins. Co.*, 86 S.W.3d at 266-67. Thus, the declaratory relief the cities sought does not change the mootness of the Cities' claims.

**Exception to Mootness**

The Cities also argue that a request for declaratory judgment is not moot if it is likely to recur. An exception to the mootness doctrine exists for acts which are "capable of repetition yet evad[e] review." *OXY U.S.A., Inc.*, 789 S.W.2d at 571. This exception applies where the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot. *Id*.

The Cities did not address the "evading review" portion of the exception. This dispute was not of such short duration that the Cities could not obtain review before the issue became moot. In fact, they might have prevented this case from becoming moot by diligently pursuing their injunctive relief hearing before the Corps issued the 404 permit and before commencement of construction on the Bayport Project. *See Bayou Liberty Ass'n, Inc. v. United States Army Corps of Engineers*, 217 F.3d 393, 398-99 (5th Cir. 2000).

21

In *Bayou Liberty*, a homeowners' association sued the Corps claiming that it issued a permit for construction of a retail complex in violation of the National Environmental Policy Act. *Bayou Liberty Ass'n, Inc.*, 217 F.3d at 395. The homeowners sought a declaration defining the obligations of the Corps when evaluating permit applications for construction in wetlands. *Id.* at 396. Construction of the retail complex was completed. *Id.* The Court of Appeals for the Fifth Circuit found that the homeowners' request for declaratory relief was moot and constituted an advisory opinion because the declaration could not affect the rights of the litigants in the case before them. *Id.* at 397-98. The court also found that the "capable of repetition yet evading review" exception did not apply:

> We are not convinced that . . . the period of time between the issuance of a Corps permit and substantial completion of construction will be too short to allow a challenge to the permit to be fully litigated. Although there may be a limited span of time between the issuance of the permit and completion of the construction, there are methods available to halt the construction and receive full review of the Corps procedures . . . . [A] plaintiff may apply for a preliminary or permanent injunction which would suspend a Corps' permit, thus halting construction. A plaintiff may also seek a stay or injunction pending appeal to halt construction while the appeal is fully considered.

*Id.* at 398-99.

There is no reason the Cities could not pursue injunctive relief in a future case; thus, the Commission's 401 certification does not inherently evade review. For this reason and on these facts, we find that the "capable of repetition yet evading review" exception to the mootness doctrine is inapplicable to this case.

22

## CONCLUSION

We conclude that the Port was not required to obtain state authorization for the Bayport Project from the Commission independent of the federal dredge-and-fill permit that the Port obtained from the Corps. We further conclude that the Cities' claims against the Commission are moot because a state court's ruling on the validity of the Commission's section 401 certification cannot have any legal effect on the Bayport Project and there is no applicable exception to the mootness doctrine. Accordingly, we affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   June 9, 2005

23